[No. 47438-7-II.   Division Two.   December 13, 2016.]

H.B.H. ET AL., *Appellants*, v. THE STATE OF WASHINGTON, *Respondent*.

*Lincoln C. Beauregard* and *Julie A. Kays* (of *Connelly Law Offices*); and *Nelson C. Fraley II* (of *Alliance Law Group PS*), for appellants.

*Robert W. Ferguson*, *Attorney General*, and *Peter J. Helmberger* and *Gregory G. Silvey*, *Assistants*, for respondent.

[As amended by order of the Court of Appeals April 18, 2017.]

¶1  BJORGEN, C.J. — KMH, HBH, SAH, KEH, and JBH[1] (collectively the children) appeal the trial court's partial dismissal of some of their claims through a CR 50 motion for judgment as a matter of law, as well as an evidentiary ruling and the final judgment in favor of the Department of Social and Health Services (DSHS). Their claims were related to incidents of child abuse by their foster, and later adoptive, parents, Scott and Drew Anne Hamrick.

¶2  The children contend that the trial court erred by (1) dismissing under CR 50 their claims regarding DSHS's failure to investigate during the period before they were adopted, (2) adopting a special verdict form that improperly asked the jury to apportion fault for both intentional torts and negligence, (3) excluding the testimony of two late-disclosed witnesses, and (4) speaking candidly about personal political leanings in court. They also assert that (5) cumulative error violated their rights to a fair trial.

¶3  In the published portion of this opinion, we hold that (1) DSHS has a duty of reasonable care to protect children it places in foster homes based on a special relationship and that the plaintiffs produced sufficient evidence to avoid dismissal under CR 50 for claims regarding DSHS's negligence during the period before the children were adopted. In the unpublished portion, we hold that (2) the trial court erred by submitting an incorrect special verdict form to the jury, but the error was harmless for those claims, (3) the trial court erred in excluding the two witnesses, but this

---

[1] We use initials to protect the privacy of those who were children at the time of the events.

error also was harmless, (4) the trial court did not create any appearance of unfairness by speaking about political matters, and (5) there was no cumulative error. Accordingly, we reverse the trial court's CR 50 ruling and remand for trial. We affirm the trial court's judgment as to the remaining claims.

## FACTS

1. Preadoption Period

¶4 In February 1998, DSHS placed KMH in foster care with the Hamricks. Social worker Amy Page was assigned to KMH's case and conducted health and safety checks. Page did not receive any information or make any observations suggesting that the Hamricks were abusing KMH or that the placement was otherwise harmful.

¶5 In October 1999, twins HBH and SAH were placed with the Hamricks as well. The twins had been in other foster homes for the preceding seven years and had suffered abuse and neglect in those homes. DSHS social worker Mary Woolridge was assigned to the twins' cases. According to agency policies, Woolridge was supposed to conduct in-home health and safety checks every 90 days, at which she was to talk with the girls about their experiences in the home. However, evidence presented at trial indicated that Woolridge may not have conducted these visits as required.

¶6 During this period, the Hamricks allegedly abused KMH, HBH, and SAH emotionally and physically, and abused SAH sexually. However, DSHS received no reports of any abuse, and individuals in contact with the children reported that they seemed happy.

¶7 In January 2000, DSHS placed KEH and JBH in the Hamricks' home. Social worker Lisa Gilman was assigned to their cases and conducted health and safety visits. Gilman did not receive any indication that abuse was occurring in the Hamrick home. Page later took over as their assigned social worker and similarly believed KEH and JBH were happy and doing well in the home.

¶8 In June 2000, DSHS conducted a home study to determine whether the Hamricks would be suitable adoptive parents. The resulting report recommended that DSHS allow them to adopt all of the children.

## 2. Postadoption Period

¶9 In October 2000, the Hamricks adopted KMH, HBH, and SAH. In January 2003, they adopted KEH and JBH as well.

¶10 In April 2008, a school counselor reported suspected physical abuse of SAH. Child Protective Services (CPS) screened this report and decided not to investigate. In November 2009, CPS received a referral related to Scott Hamrick's alleged sexual contact with a juvenile neighbor girl. CPS apparently referred this incident to local law enforcement for criminal investigation but did not investigate the Hamrick household for abuse.

¶11 In March 2010, a neighbor reported possible abuse and neglect of KEH to CPS. CPS investigated this report, visiting the Hamrick household and interviewing the children and the Hamricks. Ultimately, CPS determined that the report was unfounded.

¶12 In 2011, the Pierce County Sheriff's Department began an investigation of allegations that the Hamricks had abused KMH, HBH, SAH, KEH, and JBH. This investigation led DSHS to remove the children from the Hamrick home. Scott Hamrick committed suicide during the investigation, and Drew Ann Hamrick was charged with crimes related to the abuse.

## 3. Claims and Trial

¶13 In October 2011, HBH and SAH sued DSHS, claiming that its negligence in failing to investigate or take other protective action allowed the Hamricks to abuse them during their period as foster, and later adoptive, children in the Hamrick home. A guardian ad litem sued DSHS on

similar grounds on behalf of KMH, KEH, and JBH, who were still juveniles at the time, and the two cases were consolidated. Following an initial mistrial, the case was tried beginning in February 2015.

¶14 Several days before trial began, the children disclosed two additional witnesses who would testify concerning matters related to the 2009 CPS referral. The State objected to their testimony. The trial court excluded the witnesses as a sanction for the children's late disclosure, believing that the testimony would not add anything significant to the case.

4. CR 50 Motion

¶15 Following the close of both parties' cases, the State moved under CR 50 for judgment as a matter of law that, inter alia, DSHS was not negligent during the preadoption period or in relation to the 2009 CPS referral. The trial court agreed with the State and granted the motion. As to the preadoption period, it ruled:

> [T]here were so many people involved that were handling this prior to the adoption, all of these other voices that were coming in saying, no, there was nothing to show there was any abuse. I mean, absent — I mean, does it really matter whether Mary Woolridge was or was not doing her health and safety visits[?] . . . Seems to me most of this case comes down to what did they know and when did they know it. . . . I can't really see there are any claims based on anything Mary Woolridge did or did not do.

Report of Proceedings (RP) (Mar. 5, 2015) at 83. As to the 2009 CPS referral, the court ruled that "the fact they didn't investigate it is not evidence of any kind of negligence on their part because they didn't have any duty or obligation to investigate it." RP (Mar. 5, 2015) at 82.

5. Special Verdict Form

¶16 The trial court provided the jury a special verdict form on which it was to document its verdicts as to negli-

gence and the assignment of any resulting damages. The verdict form first asked the jury to decide whether DSHS was negligent in its treatment of the 2008 and 2010 referrals and whether its negligence proximately caused harm to the children. It then asked whether certain other nonparties' negligence proximately caused harm to KMH, HBH, SAH, KEH, and JBH. In accordance with the trial court's CR 50 rulings, the verdict form included no questions concerning the preadoption period or the 2009 referral.

¶17 The verdict form included several questions regarding damages. It asked the jury to determine "each plaintiff's total amount of damages" as a dollar value. Clerk's Papers (CP) at 638. Next, it stated:

> Assume that 100% represents the total combined negligence or fault that proximately caused each plaintiff's damages. What percentage of this 100% is attributable to each individual or entity, if any, for whom you answered "yes" in answer to [the questions concerning DSHS's and certain nonparties' negligence]? For each plaintiff, the percentage of fault must equal 100 %.

CP at 638.

¶18 The verdict form next asked, "Were the intentional acts of the following individuals a proximate cause of any of the plaintiff[s'] damages?" CP at 638. Finally, the form asked:

> What percentage of each plaintiff's damages were caused by . . . all of the intentional conduct of [Scott and Drew Ann Hamrick], and what percentage of plaintiff[s'] damages were caused by all of the negligent conduct you identified in your answers to [the questions concerning negligence]? Your answer for each plaintiff must total 100 %.

CP at 639.

## 6. Outcome of Trial

¶19 The jury found that DSHS was not negligent in its treatment of either the 2008 or 2010 CPS referrals. As a

result, it did not calculate or assign any damages to the children on the special verdict form.

¶20 The plaintiffs moved for a new trial, arguing that the trial court had erred in its CR 50 ruling, in its exclusion of the two witnesses' testimony, and in providing the special verdict form. The trial court denied the motion. The children now appeal.

## ANALYSIS

### CR 50 Motion regarding Preadoption Negligence

¶21 The children argue that the trial court erred by dismissing their claims of negligence by DSHS during the preadoption period. Underlying this request is the contention that DSHS owes a common law duty of reasonable care to protect children it places in foster homes. We agree. We further hold that the children here established genuine issues of fact as to both breach and causation and, therefore, that the trial court erred in granting the CR 50 motion and in declining to instruct the jury as to DSHS's negligence during the preadoption period.

1. Standard of Review

¶22 We review de novo a trial court's decision on a motion for judgment as a matter of law on a particular issue under CR 50. *Estate of Bordon v. Dep't of Corr.*, 122 Wn. App. 227, 240, 95 P.3d 764 (2004). Like the trial court, we must determine whether there is any legally sufficient evidentiary basis for a reasonable jury to have found for a party with respect to the issue. CR 50; *Bordon*, 122 Wn. App. at 240. We view all conflicting evidence in the light most favorable to the nonmoving party, here the children. *Bordon*, 122 Wn. App. at 240.

2. Duty To Protect

¶23 The children argue that DSHS owes a duty of reasonable care to investigate the health and safety of

children it places in foster homes based on a special protective relationship between the agency and those children.[2] We agree.

¶24 Liability in tort for negligence may lie only where the defendant owes the plaintiff a duty of care. *Caulfield v. Kitsap County*, 108 Wn. App. 242, 250, 29 P.3d 738 (2001). "As a general rule, there is no duty to prevent a third party from intentionally harming another unless 'a special relationship exists between the defendant and either the third party or the foreseeable victim of the third party's conduct.' " *Niece v. Elmview Grp. Home*, 131 Wn.2d 39, 43, 929 P.2d 420 (1997) (internal quotation marks omitted) (quoting *Hutchins v. 1001 Fourth Ave. Assocs.*, 116 Wn.2d 217, 227, 802 P.2d 1360 (1991)); *accord* RESTATEMENT (SECOND) OF TORTS § 315 (AM. LAW INST. 1965). Such a special relationship is characterized by either (1) a duty by one party to control the conduct of a third person or (2) a right by one party to the protection of the other. *Niece*, 131 Wn.2d at 43; *Caulfield*, 108 Wn. App. at 253; RESTATEMENT (SECOND) OF TORTS § 315.

¶25 "Many special relationships give rise to a duty to prevent harms caused by the intentional or criminal conduct of third parties." *Niece*, 131 Wn.2d at 44. Common examples include the relationships between schools and their students, innkeepers and their guests, common carriers and their passengers, and hospitals and their patients. *Id.*; *Caulfield*, 108 Wn. App. at 255. These relationships are " 'protective in nature, historically involving an affirmative duty to render aid.' " *Caulfield*, 108 Wn. App. at 253 (quoting

---

[2] The State argues that the trial court correctly dismissed the childrens' negligent investigation claims because DSHS did not breach the duty to investigate imposed by RCW 26.44.050. The duty to investigate under this statute arises "upon the receipt of a report concerning the possible occurrence of abuse or neglect [by] the law enforcement agency or [DSHS]." RCW 26.44.050; *see also Albertson v. State*, 191 Wn. App. 284, 301, 361 P.3d 808 (2015). The children argued in the trial court that DSHS breached its duty under RCW 26.44.050. However, on appeal they expressly disclaim any argument based on RCW 26.44.050, contending instead that DSHS's duty to perform health and safety checks was based on a special relationship of entrustment. Therefore, we need address only the latter source of duty.

*Hutchins*, 116 Wn.2d at 228). Our Supreme Court held that the duty to protect another person from the intentional or criminal actions of third parties arises "where one party is 'entrusted with the well being of another.'" *Niece*, 131 Wn.2d at 50 (quoting *Lauritzen v. Lauritzen*, 74 Wn. App. 432, 440, 874 P.2d 861 (1994)). In finding such a duty, *Niece* also relied on the vulnerability of the person harmed. *Id.* at 50-51. Similarly, this court in *Caulfield*, 108 Wn. App. at 255, held that these special relationships arise where one party is entrusted with the care of another party rendered vulnerable by the nature of the arrangement.

¶26 In finding that a social worker has no duty to protect third persons from the tortious acts of children for whom it coordinates services, Division One of our court noted that social workers are not responsible for day-to-day supervision of such children. *Terrell C. v. Dep't of Soc. & Health Servs.*, 120 Wn. App. 20, 28, 84 P.3d 899 (2004). It explained that "[a]ny 'ongoing' relationship between the social worker and the child is to prevent future harm *to that child*, not to protect members of the community from harm." *Id.* (emphasis added). Our Supreme Court later quoted this language approvingly in *Aba Sheikh v. Choe*, 156 Wn.2d 441, 450, 128 P.3d 574 (2006). However, no Washington court has yet addressed whether such an ongoing relationship between a social worker and a foster child constitutes a special relationship within the meaning of *Restatement (Second) of Torts* section 315, giving rise to a duty to protect that child from the tortious acts of foster parents. We turn to the *Restatement* and to Washington case law pertaining to foster children to meet that issue.

¶27 In defining the contours of a protective special relationship, *Niece* relied on *Restatement (Second) of Torts* section 315, among other sources. 131 Wn.2d at 43. Section 315 states:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to protection.

¶28 Comment c to this section explains that "[t]he relations between the actor and the other which require the actor to control the conduct of third persons for the protection of the other are stated in §§ 314 A and 320." RESTATE-MENT § 315 cmt. c. Section 314A, in turn, lists a number of specific relations of this type, such as common carrier and passenger, none of which involve social worker and foster child. Section 320 deals with custodial relations. Significantly, comment b to *Restatement* section 314A specifies that

[t]he relations listed are not intended to be exclusive, and are not necessarily the only ones in which a duty of affirmative action for the aid or protection of another may be found. . . . The law appears, however, to be working slowly toward a recognition of the duty to aid or protect in any relation of dependence or of mutual dependence.

Thus, we must turn back to our case law to determine the extent to which the State had a duty to protect these plaintiffs.[3]

¶29 In *M.W. v. Department of Social & Health Services*, 149 Wn.2d 589, 597, 70 P.3d 954 (2003), the court examined whether RCW 26.44.050 imposes a duty on DSHS to protect children from harm by DSHS workers while investigating potential abuse. After examining the statute and the case law interpreting it, the court held that liability under this statute arises only for children

---

[3] We note that *Restatement (Third) of Torts: Liability for Physical and Emotional Harm* section 40 (Am. Law Inst. 2012) replaced section 314A of the *Restatement (Second) of Torts*. RESTATEMENT (THIRD) § 40 cmt. a. However, no party cites to the *Restatement (Third)*, and none argue that the *Restatement (Third)* changed the principles of *Restatement (Second)* section 315 in a way that affects this appeal.

who are harmed because DSHS has gathered incomplete or biased information that results in a harmful placement decision, such as removing a child from a nonabusive home, placing a child in an abusive home, or letting a child remain in an abusive home.

*Id.* at 602. As noted above, the plaintiffs in this appeal make no claim of liability under RCW 26.44.050. Therefore, the holding in *M.W.* does not govern the resolution of this appeal.[4]

¶30 *M.W.* does contain language that, read in isolation, could suggest that all claims of negligence in monitoring the welfare of foster children are limited to this statutory liability. For example, after noting that our courts have not recognized a general tort claim for negligent investigation, the court stated, "The negligent investigation cause of action against DSHS is a narrow exception that is based on, and limited to, the statutory duty and concerns we discuss above." *Id.* at 601. However, the court's entire analysis in *M.W.* was restricted to determining whether liability lay in M.W.'s case under the statute. It examined the wording of the statute, its purpose, and case law interpreting it. Its gaze did not reach the larger question presented here: whether a special relationship is present from which a tort duty to exercise ordinary care would arise. This narrow focus on statutory liability cannot be the basis for a denial of any liability in tort, especially when the cornerstone of that liability, the special protective relationship, was not even discussed. In addition, any duty under the statute is triggered only if a report is received of possible abuse or neglect. To read *M.W.* to deny any liability outside the statute, then, is to restrict liability to situations where a report has been made. Such a narrowing of liability, and its consequent reduction of legal protection of foster children,

---

[4] The Supreme Court cited *M.W.* for its holding in *Roberson v. Perez*, 156 Wn.2d 33, 123 P.3d 844 (2005). *Roberson*, like *M.W.*, is restricted to an interpretation of liability under chapter 26.44 RCW. *Id.* at 35, 48.

cannot rest on a doubtful implication from ambiguous language. *M.W.* does not speak to the issue here before us.

¶31 Another central decision in this area is *Braam v. State*, 150 Wn.2d 689, 81 P.3d 851 (2003). The principal issue in *Braam* was whether foster children have a constitutional substantive due process right to be free from unreasonable risks of harm and a right to reasonable safety. *Id.* at 700. In holding that foster children have this right, the court specified that " 'the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.' " *Id.* at 699 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998)). Thus, *Braam*'s due process analysis and holding does not bear on the issue presented here.

¶32 The most direct authority on a common law duty of care is *Caulfield* and *Niece*. In *Caulfield*, we examined whether a special relationship arose when a county contracted with a third party to provide in-home caregiving services to a physically disabled adult as part of a program designed to support disabled people living outside of group nursing facilities. 108 Wn. App. at 255-56. We held that this was a special relationship and that it gave rise to a duty on the part of the county "to protect . . . [such] vulnerable clients from the tortious acts of others, especially when a case manager knows or should know that serious neglect is occurring." *Id.* at 256. We reasoned that because county case workers were responsible under the program for planning and monitoring care, and for terminating the contracted caregiver if care was inadequate, they must use ordinary care to protect their clients from dangers imposed by the caregiver's tortious conduct. *Id.*

¶33 The State argues that a special relationship giving rise to tort liability must be custodial in nature. However, it is clear from *Caulfield* that custody is not a crucial element of such a relationship. There, the contracted caregiver, not

the county case worker, had a custodial relationship to the disabled client. *Id*. at 245-46. The case worker's relationship with the client extended only to planning, monitoring, and providing other support services. *Id.* at 256. The fact that the case worker was entrusted with ensuring the client's well-being proved crucial in our assessment of the relationship. *Id.* at 255. *Caulfield* stands for the proposition that entrustment, not custody, is at the heart of a special protective relationship for purposes of imposing a common law tort duty. *Niece*, on the other hand, did involve a custodial relationship between the group home operator and the resident. As noted, however, *Niece* did not base its finding of a special relationship on custody, but rather on the same ground as *Caulfield*, entrustment of a vulnerable individual. *Niece*, 131 Wn.2d at 50; *Caulfield*, 108 Wn. App. at 255. Thus, the decisions of both the Supreme Court and this court signal that custody is not a prerequisite to a protective special relationship.[5]

¶34 The relationship between DSHS and children it places in foster homes is quite similar to the one analyzed in *Caulfield*. Just as the county contracted with an in-home caregiver in *Caulfield*, DSHS contracts with licensed foster parents to take in the children. *See DeWater v. State*, 130 Wn.2d 128, 136, 921 P.2d 1059 (1996). Like the county case workers, DSHS social workers are responsible for monitoring the health and safety of the children. *See* former RCW 74.13.031 (1998). Like the county's disabled adult clients, the children are especially vulnerable to harms created by their caregivers. *Aponte v. Dep't of Soc. & Health Servs.*, 92 Wn. App. 604, 622, 965 P.2d 626 (1998). The facts and policies at work in this appeal parallel those in *Caulfield*.

---

[5] Alternatively, if some degree of custody were required, it is present. In *Braam*'s discussion of a foster child's substantive due process right to be free from unreasonable risks of harm and a right to reasonable safety, the Supreme Court characterized the State as "custodian and caretaker of foster children." 150 Wn.2d at 700. This custodial relation is not somehow effaced when the inquiry shifts from substantive due process to a special relationship.

As in *Caulfield*, they lead to the presence of a special relationship.

¶35 Perhaps more to the point, *Niece* found a special relationship "where one party is 'entrusted with the well being of another' " and the entrusted party is vulnerable to a degree. 131 Wn.2d at 50 (quoting *Lauritzen*, 74 Wn. App. at 440). As noted, *Niece* did not rely on custody in finding this relationship. Absent proper monitoring by the State, a foster child is wholly exposed to the will of the foster parents, whether that will is a blessing or a horror. In this setting, the State is the last watchman of the foster child's well-being. A more compelling illustration of the bases of a special relationship established in *Niece* is hard to imagine.

¶36 For these reasons, we hold that DSHS owed the children a duty like that recognized in *Caulfield* to take ordinary care to protect them from the tortious or criminal conduct of their foster parents. The trial court erred to the extent it ruled that no such duty exists.

3.   Breach of Duty

¶37 DSHS policies require case workers to conduct health and safety checks for foster children. Evidence presented at trial showed that such visits were supposed to occur every 90 days during the first year children are in a new foster home. The evidence, however, indicated that Woolridge did not conduct such health and safety checks for SAH during the preadoption period.

¶38 DSHS's failure to conduct required health and safety checks—either at all or with sufficient regularity—constituted sufficient evidence of a breach of its duty of care to avoid dismissal under CR 50. Accordingly, the trial court erred to the extent it ruled that there was an insufficient

evidentiary basis for a reasonable jury to find that DSHS breached its duty to protect the children.[6]

4. Causation

¶39 The State argues that even if DSHS had a duty to perform health and safety checks, the children did not produce evidence from which the jury could find that a breach of that duty caused their injuries. We disagree.

¶40 To prove negligence, a plaintiff must establish that the negligent party's action or failure to act was the proximate cause of the plaintiff's harm. *Wuthrich v. King County*, 185 Wn.2d 19, 25, 366 P.3d 926 (2016). Proximate cause consists of two elements: cause in fact and legal causation. *Tyner v. Dep't of Soc. & Health Servs.*, 141 Wn.2d 68, 82, 1 P.3d 1148 (2000). Cause in fact requires a determination that if the defendant did not breach the duty of care, the plaintiff's injuries would not have occurred. *See id.* Legal causation describes the policy-based determination that the defendant's breach of the duty of care was of sufficient causal proximity to support imposition of liability for the resulting injuries. *See id.*

¶41 To establish cause in fact, a negligence plaintiff must prove that but for the defendant's breach of duty, the plaintiff would not have been injured. *Id.* This is a factual question, but may be resolved as a matter of law where a reasonable jury could reach only one conclusion based on the evidence presented. *Hungerford v. Dep't of Corr.*, 135 Wn. App. 240, 251, 139 P.3d 1131 (2006). Mere speculation or argumentative assertion of possible counterfactual events is insufficient to prove that but for the defendant's breach of duty, the plaintiff would not have been injured. *Id.* at 252, 254.

¶42 The children claim that if DSHS had properly conducted health and safety checks, they would have given the

---

[6] We do not suggest that compliance with DSHS policies is necessarily enough to ensure compliance with the duty to exercise ordinary care to protect foster children.

social worker some indication of abuse. SAH testified at trial that

> *if I felt safe* and knew—and the woman was always there, *if I felt safe*, I believe I would have said something. I was a very outspoken young girl.

RP (Feb. 11, 2015) at 32 (emphasis added). The record also shows that SAH wanted someone to give her the opportunity to tell what was happening to her and that she asked to talk privately with a therapist. The jury reasonably could have found based on this evidence that had the social worker properly performed health and safety checks, SAH or the other girls would likely have felt safe enough with the social worker to disclose the abuse or that the checks would have otherwise uncovered or given DSHS reason to suspect abuse during the preadoption period.

¶43 In addition, records of SAH's and HBH's visits with a therapist showed that the girls were "sexually acting out together and using language which you wouldn't expect a child to use." RP (Feb. 9, 2015) at 48. The children's standard of care expert testified if Woolridge had been aware of this behavior, it would have been reason to increase the health and safety checks by DSHS. The jury could reasonably have found based on this evidence that the social worker would likely have encountered similar behaviors had she properly performed health and safety checks and that such encounters would have triggered an investigation. Notably, the jury would have considered all of this evidence in light of the testimony of the children's standard of care expert that proper health and safety checks in general help built rapport, encourage honest communication, and provide an avenue for disclosure of abuse and for observation of various indicators of abuse.

¶44 This evidence supplies a sufficient basis for a reasonable jury to find that but for the allegedly deficient health and safety checks, SAH or one of the other girls would have disclosed the abuse and the State would have

intervened. Whether or not there was evidence that Woolridge supervised the placement of children other than HBH and SAH, a jury could reasonably infer that intervention by Woolridge would have led to protection of the other children against subsequent abuse. This also provides a sufficient basis for a finding of legal causation. With this, there was a sufficient evidentiary basis for a reasonable jury to find that DSHS's breach of its duty to protect the children was a proximate cause of their injuries. Therefore, the trial court erred in entering judgment as a matter of law under CR 50 on the children's claims regarding the preadoption period.

## CONCLUSION

¶45 We hold that DSHS has a duty to exercise ordinary care to protect foster children on the basis of its special relationship with such children. We hold also that the evidence, viewed in the light most favorable to KMH, HBH, SAH, KEH, and JBH, supplied a legally sufficient evidentiary basis for a reasonable jury to find by a preponderance that DSHS breached that duty during the preadoption period and proximately caused at least some of the children's damages. Consequently, we reverse the trial court's CR 50 ruling and remand for trial.

¶46 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON and MAXA, JJ., concur.

Reconsideration denied April 18, 2017.

Review granted at 189 Wn.2d 1002 (2017).