# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| KYLE P. KEELY, individually and as the natural father and guardian of M.K., a minor. | No. 51639-0-II |
| Respondent, | |
| v. | |
| STATE OF WASHINGTON, | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, J. — Kyle P. Keely, individually and on behalf of his child, M.K., sued the State of Washington for allegedly failing to provide adequate services and failing to investigate the home of M.K.'s mother, Robin Ross. M.K. lived with Ross until Ross's older son assaulted and severely injured M.K. when he was 10 months old.

The State moved for summary judgment on the basis that Keely could not establish that the Department of Social and Health Services (DSHS)[1] owed M.K. a legal duty and that Keely could not establish causation. The trial court denied the State's motion.

We reverse the trial court's denial of summary judgment on the basis that Keely cannot establish factual causation on his claims.

---

[1] Starting July 1, 2018, the Department of Social and Health Services and the Children's Administration and Department of Early Learning ceased to exist and the Department of Children, Youth, and Families took over all functions of both agencies. LAWS OF 2017, ch. 6, § 101. Because the lawsuit in this case commenced before the name change, we refer to the agency as DSHS.

FACTS

I. REFERRALS

A. APRIL 30, 2010 REFERRAL

DSHS received a referral on April 30, 2010 concerning possible negligent treatment or maltreatment of C.J. and Ra.R. The referent was concerned because C.J. was falling asleep in class on a regular basis and his teacher struggled to wake him. C.J. told his teacher that his mother, Ross, wakes up him and his little brother, Ra.R., before she goes to work in the morning at 5:00 AM. At the time, C.J. was 11 years old and Ra.R. was 7 years old. DSHS "Screen[ed] Out"[2] the referral on the grounds that the referent did not make a specific allegation of child abuse or neglect. Clerk's Papers (CP) at 45.

B. MAY 28, 2010 REFERRAL

One month later, on May 28, 2010, DSHS received a second referral concerning possible negligent treatment or maltreatment of C.J. and Ra.R. The day before, Ross left C.J. and Ra.R. home alone while she and her boyfriend drove to Seattle to "[get] drunk." *Id.* at 63. That evening, Ross's boyfriend beat Ross by hitting her over 30 times, choking her, and dragging her by her hair down a city block. At the time, Ross was pregnant with her boyfriend's child and her boyfriend was living in Ross's home.

Ross was taken to the emergency room and treated for her injuries. The referent reported to DSHS that Ross was at the hospital and Ross stated that she was worried about her children.

---

[2] "Screened-out" means "a report of alleged child abuse or neglect that [DSHS] has determined does not rise to the level of a credible report of abuse or neglect and is not referred for investigation." Former RCW 26.44.020(21) (2012).

The referent called C.J. and Ra.R., who told the referent they were "fearful" and home alone. *Id.* at 48. The referent was "very concerned about the children who were left alone and exposed and placed at risk of harm." *Id.* at 49. The referent was of the "opinion that the family desperately needs services and help." *Id.* The referent contacted Ross's estranged husband and Ra.R.'s biological father, and he picked up C.J. and Ra.R. from the home.

DSHS "Screen[ed] In" the referral for investigation on the basis that Ross left C.J. and Ra.R. alone for an extensive period of time and Ross allowed her "violent boyfriend" to stay in the home. *Id.* at 48-49. The report also listed additional "Risk Factors": Ross was six months pregnant, lost her house to foreclosure, and was in the middle of a divorce. *Id.* at 49. DSHS completed a "Safety Assessment" and determined that Ross's home indicated a "pattern of neglect/incidents/injuries" involving Ross's children, "which [was] escalating in severity." *Id.* at 222.

Interviews throughout DSHS's investigation revealed that Ross had been romantically involved with her boyfriend, an actively using drug dealer, since the fall of 2009 and moved him into her home. Ross admitted to using cocaine with her boyfriend in May 2010. Ross had a "history of severe drug use," including numerous criminal convictions related to drug use beginning in 1994. *Id.* at 64. Ross also suffered from mental illness and severe childhood trauma. Ross stated her only support was her mother, and "she [had] no one to count on." *Id.* at 66.

The investigation also revealed that Ross left her children home alone on a regular basis. Ross often left her children home alone in the evenings and through the night. C.J. did not "feel safe often because of" Ross's boyfriend. *Id.* at 64. C.J. had been diagnosed with attention deficit

hyperactivity disorder. Ra.R had severe asthma and was "Autistic/Asbergers." *Id.* at 63. Ra.R. had "breathing treatments daily and [had] to be monitored well because of his Autism." *Id.*

The record does not indicate when C.J. and Ra.R. returned to Ross's care. A case note indicates that C.J. returned to Ross's care on or before July 9, 2010, but Ra.R. was still living with his biological father. On August 4, 2010, Ross gave birth to S.H.[3] DSHS received a separate referral and a social worker noted S.H.'s birth in Ross's case file. By August 20, 2010, all three of Ross's children were living in Ross's home.

As a result of the investigation, DSHS recommended Ross complete a drug and alcohol program, a mental health assessment, and participate in domestic violence services. On August 20, Ross met with a social worker to discuss DSHS's recommendation that Ross complete an "Intensive outpatient" drug and alcohol program. *Id.* at 200. The program included six months of "[c]ontinuing [c]are" counseling sessions, individual counseling, and participation in support groups. *Id*. Ross told the social worker that she was "not too happy" about the recommendations. *Id*. The case note from August 20 indicates that Ross was not engaged in any domestic violence services and had not completed a mental health assessment.

On September 22, a social worker noted that Ross was "linked" to domestic violence and mental health services. *Id.* at 201. On October 15, a social worker noted that Ross's case was "getting close to closing." *Id.* at 202. The social worker reported that Ross was involved with drug and alcohol services, but Ross still needed "to get involved with [domestic violence] services and support groups." *Id*. Ten days later, a social worker reported that Ross was "following through

---

[3] Appellant's brief refers to S.H. as S.R. However, the record refers to this child as only S.H. Therefore, we use S.H.

with [drug and alcohol] outpatient treatment, [domestic violence] support group, and her one on one mental health counseling." *Id.*

There is no further reporting by DSHS regarding Ross's compliance with DSHS recommended services. On November 23, a social worker reported that Ross's case was "staffed for closure back in Oct., however [Ross] called for some assistance due to her leaving her job to become a stay at home mom." *Id.* at 204.

DSHS "completed" its investigation and closed Ross's case on or around December 10. *Id.* at 59. DSHS determined that the allegations were "founded for negligent treatment/maltreatment" and the risk of child abuse and neglect of Ross's children was "high." *Id.* The case was closed because Ross "followed through [with] all services, namely [domestic violence] services as well as [drug and alcohol] treatment." *Id.* at 67.

C. JUNE 10, 2011 REFERRAL

DSHS received a referral on June 10, 2011 concerning possible negligent treatment or maltreatment of C.J., Ra.R., and S.H. At the time, C.J. was 12 years old, Ra.R. was 8 years old, and S.H. was 10 months old.[4] Ross's sister called Child Protective Services[5] (CPS) to report that she had spoken to Ross on the phone and Ross was slurring her words. Ross also told her sister that she was going on drug "binges" and that she was not a good mother. *Id.* at 283. Ross's sister contacted CPS out of concern for Ross's children. The intake report states,

---

[4] The second page of the intake report mistakenly states that C.J was 14 years old and S.H. was 2 years old at the time of the referral.

[5] "Child Protective Services" means those services provided by DSHS. Former RCW 26.44.020(3).

> Mother has a history of heroin addiction. Today . . . mother was slurring her words during a phone conversation. Mother said she is not a good mother. She also reported being on a binge. No information about how mother's drug use is affecting the children.

*Id.* at 72. Ross's sister gave CPS her name and phone number.

The intake worker "Screened In" the allegation for investigation and assigned a response time of 10 days. *Id.* at 73. The intake supervisor changed the response time to 72 hours "due to baby being in home; [Ross] has FOUNDED intake . . . for older sons; [Ross] may have substance abuse issues." *Id.* Three days later, an area administrator at DSHS's regional headquarters overrode the intake supervisor's decision. The area administrator "Screen[ed]-Out" the referral because "there is no allegation of how this is affecting the children, caller doesn't know mother is using again." *Id.* at 76. The investigation assessment states, "Unable to complete invest[igation] – No Finding." *Id.* at 75.

In a subsequent statement, Ross explained,

> Sometime between May 2011 and June 10, 2011 I conversed with my sister, A.S. I informed her that I had relapsed and was again binging on drugs. I informed her I was not a good mother. This was a cry for help as I was very deep into drug abuse and desperately wanted treatment but felt it was impossible given my status as a single, working mother.

*Id.* at 284.

DSHS did not contact Ross or her sister in response to the June referral. Ross stated that had she been contacted, she would have accepted services as she did following the May 2010 referral. When Ross's sister made the referral, Ross was pregnant with M.K. Ross was unaware of her pregnancy.

## II. EVENTS RELATING TO M.K.

M.K. was born on February 22, 2012. M.K was born healthy and was generally a healthy child for the first nine months of life. DSHS was informed of M.K.'s birth on February 28 because Ross sought services for M.K.

On December 1, Ross left her children unattended to go on a drug binge. At the time, C.J. was 14 years old, Ra.R. was 10 years old, and S.H. was 2 years old. While the children were unattended, C.J. became upset when M.K. spit up his milk. C.J. hit M.K. in the head with a rubber ball, shook M.K., and threw him onto a bed. Ross did not come home that night. It is unclear when Ross returned home, but M.K. did not receive medical care until approximately 18 hours after his injuries. M.K. suffered permanent brain damage.

DSHS investigated this incident. During the investigation, Ross stated that C.J. had anger issues and violent tendencies. C.J. was violent toward Ra.R., S.H., and Ross. On several occasions, C.J. hit Ra.R. in the head, pulled a knife on Ra.R., and choked Ra.R. until he couldn't breathe. C.J. also hit S.H. and had attempted to hit Ross on several occasions. C.J.'s violent tendencies surfaced about a year before the incident. C.J. often yelled at M.K. and asked Ross to keep M.K. in his crib all day. About two weeks before the incident, C.J. told Ross that he hated M.K. and wanted him dead. Following the incident, C.J. was charged with first degree assault of M.K. and Ross was charged with first degree criminal mistreatment.

## III. PROCEDURAL HISTORY

Keely, individually and on behalf of his child, M.K., sued the State for negligence. Keely alleged that the State owed M.K. a statutory and a common law duty of protection from abuse and neglect, and the State breached its duties when it failed to fully investigate allegations of child

abuse and neglect following the May 28, 2010 referral and failed to perform any investigation into allegations of child abuse and neglect following the June 10, 2011 referral. Keely alleged that these failures resulted in DSHS's failure to take steps to protect M.K., which directly and proximately resulted in the injuries M.K. sustained on December 1, 2012.

The State moved for summary judgment, arguing that the State did not owe M.K. a duty of protection under statutory law or a duty based on common law, and Keely cannot establish factual or legal causation. The trial court denied the State's motion for summary judgment.

The State moved to certify the matter for appeal pursuant to CR 54(b). The trial court agreed and certified the matter for appeal.

## DISCUSSION

The State argues that the trial court erred when it denied its motion for summary judgment because it did not owe M.K. a statutory duty of protection under former RCW 26.44.050 (2012) or a duty of protection based on common law. The State further argues that even if it owed M.K. a duty of protection, Keely cannot establish proximate cause under the facts of this case. Keely argues that the trial court did not err when it denied the State's motion for summary judgment because the State owed M.K a duty as an immediate member of Ross's family. Keely also argues that the State breached its duty when DSHS failed to provide adequate services after the May 2010 referral and failed to investigate the June 2011 referral, and that M.K.'s injuries are a direct and proximate result of DSHS's failures.

We hold that even assuming the State owed M.K. a duty of protection and it breached its duty by failing to provide adequate services and failing to investigate, the trial court erred in denying summary judgment because Keely cannot establish factual causation.

I. STANDARD OF REVIEW

We review an order for summary judgment de novo, performing the same inquiry as the trial court. *Aba Sheikh v. Choe*, 156 Wn.2d 441, 447, 128 P.3d 574 (2006). We view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences from the evidence in that party's favor. *Boone v. Dep't of Soc. & Health Servs.*, 200 Wn. App. 723, 731, 403 P.3d 873 (2017). "Summary judgment is proper when the record demonstrates there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Munich v. Skagit Emergency Commc'ns Ctr.*, 175 Wn.2d 871, 877, 288 P.3d 328 (2012). If a genuine issue of fact exists as to any material fact, a trial is necessary. *Lish v. Dickey*, 1 Wn. App. 112, 113, 459 P.2d 810 (1969).

A claim for liability cannot rest on a speculative theory or an argumentative assertion of possible counterfactual events. *Martini v. Post*, 178 Wn. App. 153, 165, 313 P.3d 473 (2013); *H.B.H. v. State*, 197 Wn. App. 77, 93, 387 P.3d 1093 (2016), *aff'd*, 192 Wn.2d 154, 429 P.3d 484 (2018). To survive summary judgment, a plaintiff must present "'some competent evidence of factual causation' that precludes jury speculation." *Behla v. R.J. Jung, LLC*, 11 Wn. App. 2d 329, 347, 453 P.3d 729 (alteration in original) (quoting *Estate of Bordon ex rel. Anderson v. Dep't of Corr.*, 122 Wn. App. 227, 242, 95 P.3d 764 (2004)), *review denied*, 195 Wn.2d 1012 (2020). The evidence may be circumstantial, so long as the evidence "'allow[s] a reasonable person to conclude that the harm more probably than not happened in such a way that the moving party should be held liable.'" *Martini*, 178 Wn. App. at 165 (alteration in original) (quoting *Little v. Countrywood Homes, Inc.*, 132 Wn. App. 777, 781, 133 P.3d 944 (2006)).

No. 51639-0-II

## II. CAUSATION

### A. LEGAL PRINCIPLES

The State of Washington, through DSHS, has a mandatory duty to investigate child abuse. Former RCW 26.44.050. The duty to investigate under former RCW 26.44.050 "derives from the paramount importance that is placed on the welfare of the child." *Rodriguez v. Perez*, 99 Wn. App. 439, 444, 994 P.2d 874 (2000). Former RCW 26.44.050 states in relevant part,

> [U]pon the receipt of a report concerning the possible occurrence of abuse or neglect, the law enforcement agency or the department must investigate and provide the protective services section with a report.

DSHS's statutory duty implies a cause of action for children when DSHS fails to adequately investigate a child's living situation before making a placement decision, lets a child remain in an abusive home, or places a child in an abusive home. *M.W. v. Dep't of Soc. & Health Servs.*, 149 Wn.2d 589, 595, 70 P.3d 954 (2003). The duty requires DSHS to act reasonably while investigating, which includes protecting children from potential abuse. *Tyner v. Dep't of Soc. & Health Servs.*, 141 Wn.2d 68, 79, 1 P.3d 1148 (2000).

To prevail on a negligent investigation claim, a plaintiff must establish that the State owed a legal duty to the plaintiff. *Yonker v. Dep't of Soc. & Health Servs.*, 85 Wn. App. 71, 77, 930 P.2d 958 (1997). Once a duty is established, the plaintiff must show that the State breached its duty when it failed to conduct an adequate investigation and the investigation's deficiencies proximately caused a harmful placement decision by DSHS. *M.W.*, 149 Wn.2d at 602.

10

B. CAUSE IN FACT

The State argues that even if DSHS owed a duty to M.K., Keely cannot establish a question of fact as to whether DSHS's actions and omission were the proximate cause of M.K.'s injuries. We agree.

Even assuming the State owed M.K. a duty of protection and it breached its duty by failing to provide adequate services following the May 2010 referral and failing to investigate the June 2011 referral, the trial court erred in denying summary judgment because Keely cannot establish factual causation. *H.B.H.*, 197 Wn. App. at 93.

Proximate cause has two elements: cause in fact and legal causation. *Tyner*, 141 Wn.2d at 82. Cause in fact exists when "but for" the defendant's actions, the claimant would not have been injured. *Id.* In most instances, cause in fact is a question for the trier of fact and not susceptible to summary judgment. *Martini*, 178 Wn. App. at 164. Cause in fact may be resolved as a matter law where a reasonable jury could reach only one conclusion based on the evidence presented. *H.B.H.*, 197 Wn. App. at 93.

The State argues that Keely cannot establish a question of fact as to whether DSHS's decision to close its investigation in December 2010 following the May 2010 referral or its decision not to investigate the June 2011 referral proximately caused M.K.'s injuries. The State argues that even if DSHS had acted differently, the trier of fact would still need to speculate that (1) Ross would have engaged in services and those services would have equipped Ross with the necessary tools to prevent C.J. from assaulting M.K., or (2) either M.K. or C.J. would have been removed from Ross's home. The State further argues that whether Ross engaged in services is irrelevant to

cause in fact; the question is whether DSHS would have provided Ross services that would have enabled Ross to prevent C.J. from assaulting M.K.[6]

A reasonable person could conclude that but for Ross's negligent treatment of leaving M.K. unattended by an adult, M.K. would not have been at risk in general for injury. Keely presented evidence that Ross left M.K., an infant, and the rest of her children unattended by an adult to use drugs. CP at 285, 297. While unattended, M.K. was assaulted by C.J., his older brother, who Ross knew had violent tendencies and did not like M.K. CP at 297. However, although Ross's neglect presented an opportunity for C.J. to harm M.K., ultimately, it was C.J.'s anger issues and violent tendencies that caused of M.K.'s injuries. Therefore, the question here is if DSHS had provided Ross with adequate services following the May 2010 referral, and if DSHS had accepted the June 2011 referral and conducted an investigation, would DSHS have discovered C.J.'s violent tendencies towards other children in the home and would such discovery have enabled DSHS to prevent M.K.'s injury in December 2012.

Viewing the evidence in the light most favorable to Keely, there is still a missing link in the chain of causation. Keely presented no evidence of C.J.'s violent tendencies or anger issues at the time of the May 2010 referral or at the closure of Ross's case in December 2010. Rather,

---

[6] The State raises a new argument on appeal regarding causation. The State argues that Keely cannot establish causation because Keely failed to present evidence that DSHS had authority to remove M.K. from Ross's care because Washington's dependency statutes limit DSHS's ability to remove children from their home or from their parents' care. As this argument was raised for the first time on appeal, we do not consider or address it.

the record indicates that C.J.'s violent tendencies surfaced in 2011.[7] Therefore, even if DSHS provided additional services following the May 2010 referral, it is far too speculative to assume that DSHS would have discovered C.J.'s violent tendencies because the record indicates that they surfaced a year later.

Even if we assume that C.J.'s anger issues and violent tendencies would have been revealed during an investigation in June 2011, it is far too tenuous to infer from the evidence that the harm to M.K. would have been prevented. In order to come to this conclusion, we would need to either adopt the possible theory that as part of the services provided to Ross, DSHS would have also provided services to C.J., C.J. would have participated in services, and the services would have fully addressed his anger to prevent M.K.'s injuries, or the possible theory that C.J. would have been permanently removed from the home. Keely does not present any evidence supporting these theories. Without evidence supporting a reasonable inference of either theory, both are speculative as to proximate cause. While Keely speculates that DSHS could have taken a number of steps that might have contributed to the prevention of M.K.'s harm, this type of speculation is insufficient to create a genuine issue of material fact as to whether M.K.'s injuries would have been prevented had DSHS intervened.

Therefore, viewing the evidence in the light most reasonable to Keely, we hold that a reasonable jury could not find a genuine issue of material fact as to whether DSHS's failure to provide adequate services and failure to investigate caused M.K.'s injury.

---

[7] Ra.R. stated that C.J. became violent towards him when he was nine years old. Ra.R. was nine years old in 2011. Ra.R. also told his biological father that C.J. was "mean" to him and had choked him around six to eight months before the incident involving M.K., which would have been in the spring of 2012.

No. 51639-0-II

CONCLUSION

Even assuming that the State owed a duty to M.K. and the duty was breached, Keely cannot establish a genuine issue of material fact as to whether DSHS's breach was the proximate cause of M.K.'s injuries. Therefore, we hold that the trial court erred when it denied the State's motion for summary judgment. We reverse.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, J.

We concur:

WORSWICK, J.

LEE, C.J.