

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE NOV 0 1 2018

Fairhurst, C.J.
CHIEF JUSTICE

This opinion was filed for record

at 8:00 a.m. on Nov 1, 2018

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| H.B.H.; S.A.H.; and TREY HAMRICK, litigation guardian ad litem on behalf of K.E.H., J.B.H., and K.M.H., | |
| Respondents, | NO. 94529-2 |
| v. | |
| STATE OF WASHINGTON, | EN BANC |
| Petitioner, | |
| and | |
| TOWN OF EATONVILLE, | Filed NOV 0 1 2018 |
| Defendant. | |

STEPHENS, J.—Former foster children KMH, HBH, SAH, KEH, and JBH brought this case against the Department of Social and Health Services (DSHS), alleging negligence in failing to protect them from the tortious or criminal acts of their foster, and later adoptive, parents. At the close of the evidence, the trial court granted DSHS's CR 50 motion and dismissed the children's claims of negligence

concerning the preadoption, foster care period. Division Two of the Court of Appeals reversed, holding that DSHS owes a common law duty to protect dependent foster children from foreseeable harm based on the special relationship between DSHS and such children.

This holding is correct. Under well-established common law tort principles, DSHS owes a duty of reasonable care to protect foster children from abuse at the hands of their foster parents. The evidence at trial was sufficient to present a jury question as to whether DSHS breached this duty and caused the plaintiffs harm. We affirm the Court of Appeals and remand for trial on the preadoption claims.

## FACTS AND PROCEDURAL HISTORY

DSHS placed KMH in foster care with Scott and Drew Ann Hamrick in February 1998. Social worker Amy Page was initially assigned to KMH's case, before being replaced by Renee Harvey in 1999. KMH also had two guardians ad litem and a therapist during the preadoption period. The record suggests that there were no observations or reports of any problems with KMH's placement during this time.

In October 1999, DSHS placed twins HBH and SAH with the Hamricks. HBH and SAH had been removed from their parents in 1994 and had been placed in several foster homes in the years preceding their placement with the Hamricks. They

suffered abuse and neglect in those foster homes. DSHS social worker Mary Woolridge was assigned to the twins' cases in February 1999. According to DSHS policies, Woolridge was required to conduct regular in-home health and safety checks every 90 days to determine whether the children felt safe or had concerns about their new foster home setting. Evidence presented at trial indicated that Woolridge failed to conduct these health and safety visits as required. DSHS records show no visits and no reports between October 1999 (the date HBH and SAH were placed in the Hamrick home) and October 2000 (the date the girls were adopted by the Hamricks).

In January 2000, DSHS also placed KEH and JBH in the Hamricks' home. DSHS social worker Liza Gilman was initially assigned to the girls' cases, followed by social workers Sally Bryan, Amy Page, and Anna Tran. The record indicates that each social worker conducted health and safety visits, and did not observe or receive any information about abuse occurring in the Hamrick home.

In June 2000, DSHS conducted a home study to determine whether the Hamricks would be suitable adoptive parents. The resulting report recommended that DSHS allow the Hamricks to adopt all of the children. In October 2000, the Hamricks adopted KMH, HBH, and SAH. A few years later, in January 2003, the

Hamricks adopted KEH and JBH. DSHS involvement with the children ended upon their adoptions.

Evidence at trial showed that the Hamricks abused all five girls physically, sexually, and psychologically during the preadoption period from 1998 to 2003. DSHS did not obtain any information concerning abuse during this period, however, and the social workers in contact with the children reported that the children seemed happy in the Hamricks' home.

In April 2008, following the children's adoption by the Hamricks, Child Protective Services (CPS) received a written referral from a school counselor who suspected physical abuse of SAH. CPS screened the report and decided not to investigate. In November 2009, CPS received another referral related to Scott Hamrick's alleged sexual contact with a juvenile neighbor girl; this referral noted that there were multiple adopted children within the Hamrick home. CPS referred the incident to law enforcement but did not conduct its own investigation or otherwise follow up on the report. In March 2010, a neighbor reported possible abuse and neglect of KEH to CPS. This time, CPS investigated the referral but determined the report was unfounded.

In 2011, the Pierce County Sheriff's Department began investigating allegations that the Hamricks were abusing KMH, HBH, SAH, KEH, and JBH. The

investigation resulted in DSHS removing the children from the Hamrick home. Scott Hamrick committed suicide during the criminal investigation. Drew Ann Hamrick was eventually charged and convicted of crimes related to the abuse.

In September 2011, HBH and SAH brought this civil suit against DSHS, alleging that its negligence in failing to investigate or take other protective action during the preadoption period allowed the Hamricks to abuse them as foster and, later, adopted children. A separate suit was filed through a guardian ad litem on behalf of KMH, KEH, and JBH, who were still minors at the time. The two cases were eventually consolidated and went to trial. The jury heard evidence over approximately six weeks of testimony.

Following the close of both parties' cases, DSHS moved under CR 50 for judgment as a matter of law, arguing that it was not negligent during the preadoption period. The trial court granted DSHS's motion as to the preadoption period.[1] The jury returned a defense verdict on the remaining claims.

---

[1] The CR 50 motion also encompassed claims of negligence based on the 2009 CPS referral. The trial court granted DSHS's motion for judgment as a matter of law, ruling that "the fact [DSHS] didn't investigate it is not evidence of any kind of negligence on their part because they didn't have any duty or obligation to investigate it." Verbatim Report of Proceedings (Mar. 5, 2015) at 82. The foster children did not appeal that aspect of the trial court's ruling.

On appeal, the foster children argued that the trial court erred in dismissing their claims of negligence by DSHS concerning the preadoption period. They did not seek to revive claims based on DSHS's statutory duty to investigate[2] but, instead, argued that DSHS owed a common law duty of reasonable care to protect foster children based on the special protective relationship between the agency and such children. They further argued that DSHS breached that duty by failing to protect them from the tortious or criminal acts of their foster parents. DSHS contended that no special relationship should be recognized because DSHS did not have physical custody of the foster children, who at all relevant times were in the care of the Hamricks.

The Court of Appeals reversed the trial court's CR 50 order relating to the preadoption period, holding that DSHS stands in a protective special relationship with foster children within the meaning of *Restatement (Second) of Torts* § 315(b) (Am. Law Inst. 1965). *H.B.H. v. State*, 197 Wn. App. 77, 92, 387 P.3d 1093 (2016). Relying on both the *Restatement* and Washington case law, the court concluded that "entrustment, not custody, is at the heart of a special protective relationship for purposes of imposing a common law tort duty." *Id.* at 91. The court further held

---

[2] At trial, the foster children had argued that DSHS breached its statutory duty to investigate child abuse as required under RCW 26.44.050.

that the foster children produced sufficient evidence of breach and causation to avoid dismissal under CR 50 of their claims relating to DSHS's negligence during the preadoption period. *Id.* at 92-95. The court remanded for trial on the preadoption negligence claims. We granted DSHS's petition for review. *H.B.H. v. State*, 189 Wn.2d 1002, 404 P.3d 1162 (2017).

## ANALYSIS

Courts are appropriately hesitant to take cases away from juries. A CR 50 motion for directed verdict or judgment as a matter of law should be granted only when, after viewing the evidence in the light most favorable to the nonmoving party, there is no substantial evidence or reasonable inferences therefrom to support a verdict for the nonmoving party. *Goodman v. Goodman*, 128 Wn.2d 366, 371, 907 P.2d 290 (1995).

DSHS argues dismissal was appropriate in this case because it owes no common law duty to foster children to protect them from abuse by foster parents. DSHS contends that the Court of Appeals erred in holding that a *Restatement* § 315(b) protective special relationship exists between DSHS and dependent foster children and that imposing a duty here would effectively abrogate the State's sovereign immunity. As an alternative basis to affirm the trial court, DSHS argues

that the plaintiffs presented no evidence to allow a jury to find DSHS breached its duty and caused harm. As did the Court of Appeals, we reject these arguments.

A. DSHS's Role as Parens Patriae in the Child Welfare System

The primary issue in this case is whether DSHS has a special relationship with dependent foster children in its charge, providing such children a right to protection from the tortious or criminal acts of their foster parents. DSHS describes its role in the foster care system as limited to "engag[ing] in reviews, visits, assistance, and services directed by statutes and courts." State's Suppl. Br. at 19. According to DSHS, "[t]his comprehensive, but statutorily defined, non-custodial power, together with the statutory role of foster homes to provide custody, explains why DSHS does not have a special relationship with foster children." *Id.* Given DSHS's insistence that its limited relationship with dependent foster children is statutorily defined, it seems only natural that we begin our analysis by looking at the relevant statutes. A careful review of the statutory framework is imperative to understanding the relationship between DSHS and dependent children placed in foster care.

It is well established that while parents have a fundamental liberty interest in the care and custody of their children, the State has an equally compelling parens patriae interest in protecting the physical, mental, and emotional health of children in this state. *In re Dependency of Schermer*, 161 Wn.2d 927, 941, 169 P.3d 452

(2007). When a child's health, safety, and welfare are seriously jeopardized by parental deficiencies, the State has the power to intervene and act in its capacity as provider of protection to those unable to care for themselves. *Id.* at 941-42; *In re Welfare of Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980) ("[W]hen parental actions or decisions seriously conflict with the physical or mental health of the child, the State has a parens patriae right and responsibility to intervene to *protect the child.*" (emphasis added)). In situations where the State exercises its parens patriae right to intervene by removing children from their homes and placing them in foster care, the State has a statutory and constitutional duty to ensure that those children are free from unreasonable risk of harm, including a risk flowing from the lack of basic services while under the State's care and supervision. *Braam v. State*, 150 Wn.2d 689, 699, 81 P.3d 851 (2003). "[A]s custodian and caretaker of foster children," the State is required to "provide conditions free of unreasonable risk of danger, harm, or pain, and must include adequate services to meet the basic needs of the child." *Id.* at 700.

Balancing the interests of parents, children, and the State, the legislature has created a comprehensive statutory framework to govern the State's role as parens patriae in the child welfare system. *See* chs. 13.34 RCW (Juvenile Court Act), 26.44 RCW (Child Abuse and Neglect Act), 74.13 RCW (child welfare services), 74.15

RCW (care of children, expectant mothers, persons with developmental disabilities). The purpose of Washington's statutory scheme is "to safeguard, protect, and contribute to the welfare of the children of the state." RCW 74.13.010. Consistent with this purpose, the guiding principal of our child welfare system is that "the child's health and safety shall be the paramount concern." RCW 13.34.020. Washington's statutory framework is unique in this regard: it expressly places the rights of the child above the rights of parents. "When the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, the rights and safety of the child should prevail." *Id.*

A detailed statutory scheme authorizes the State to remove a child from the family home, take the child into state custody, and declare the child "dependent"[3] when doing so is in the best interest and safety of the child. RCW 26.44.010; *Schermer*, 161 Wn.2d at 942. The dependency process is initiated when DSHS

---

[3] RCW 13.34.030(6) defines a "dependent child" as any child who
    (a) Has been abandoned;
    (b) Is abused or neglected as defined in chapter 26.44 RCW by a person legally responsible for the care of the child;
    (c) Has no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development; or
    (d) Is receiving extended foster care services, as authorized by RCW 74.13.031.

receives a report that a child has been abused, neglected, or abandoned. RCW 26.44.050. Upon receiving the report, DSHS assigns a social worker to investigate the allegations. If there appears to be merit to the allegations of abuse and the child is in immediate danger, the social worker may file a dependency petition with the juvenile court to remove the child from the family home. RCW 13.34.040(1). The court may then order "a law enforcement officer, probation counselor, or child protective services official" to take the child into state custody if it finds reasonable grounds to believe the child is dependent and that the child's "health, safety, and welfare will be seriously endangered if not taken into custody." RCW 13.34.050(1).

Within 75 days of a dependency petition being filed, the juvenile court must hold a fact-finding hearing to determine whether the child is "dependent." RCW 13.34.070(1). The petitioner, typically DSHS, bears the burden of establishing by a preponderance of the evidence that the child is dependent within the meaning of RCW 13.34.030. RCW 13.34.110(1). If the child is found to be dependent, the court must then determine where the child will be placed and the services to be provided. RCW 13.34.130, .136; *Schermer*, 161 Wn.2d at 942. If the court concludes that the child cannot remain in the parental home, the court may order the child to be placed with DSHS, which has the authority to accept legal custody of dependent children. RCW 13.34.130(1)(b)(i) (juvenile court shall "[o]rder the child to be removed from

his or her home and into the custody, control, and care of . . . the department . . . for supervision of the child's placement"); RCW 74.13.031(7) ("The department shall have authority to accept custody of children from parents and to accept custody of children from juvenile courts, where authorized to do so under law.").

When the court places a dependent child with DSHS, as in this case, DSHS is the sole legal custodian of the child. JuCR 3.8(e) (when the disposition requires that the child be removed from the parental home, it has the effect of transferring legal custody to the agency or custodian charged with the child's care). The transfer of legal custody charges DSHS with the following duties: (1) maintaining physical custody of the child, (2) protecting, training, and disciplining the child, and (3) providing food, clothing, shelter, education, and routine medical care. *Id.* Of course, DSHS retains the right to designate agents to carry out certain duties granted to it as a result of the transfer of legal custody. For example, when DSHS accepts custody of a dependent child, DSHS has not only a duty to maintain the physical custody of the child but also the "authority to place the child . . . in a foster family home or group care facility licensed pursuant to chapter 74.15 RCW." RCW 13.34.130(b)(ii). However, when DSHS places a dependent child in the physical care of licensed foster parents, DSHS remains the child's legal custodian throughout the duration of the dependency.

The two basic principles of foster care are that the child is placed on a temporary basis with a foster family and DSHS reserves the right to remove the child at any time from the foster home. Foster care serves as a substitute for parental care until the child can be returned to the family home or another permanent placement can be made. In addition to its initial duty to investigate foster homes for licensing purposes, DSHS has a continuing duty to investigate allegations of abuse and to monitor the dependent child in the foster home. *See* RCW 74.13.031(3) ("[t]he department shall investigate complaints of any recent act or failure to act on the part of a parent or caretaker"), (6) ("The department shall monitor placements of children in out-of-home care and in-home dependencies to assure the safety, well-being, and quality of care being provided is within the scope of the intent of the legislature as defined in RCW 74.13.010 and 74.15.010.").

Unlike DSHS, foster parents have no legally recognized parental interest in the dependent children placed in their homes. *See In re Dependency of J.H.*, 117 Wn.2d 460, 472, 815 P.2d 1380 (1991) (holding that foster parents do not have "liberty interest" sufficient to require procedural due process before foster children can be removed from their foster home); *In re Baby Girl Coverdell*, 30 Wn. App. 677, 637 P.2d 991 (1981) (holding that foster parent had no right to intervene in dependency proceedings). In making this observation, we do not minimize in the

slightest the significant and invaluable role played by foster parents in the delivery of child welfare services to dependent children in this state. Foster parents take on the day-to-day parental responsibilities. *Aba Sheikh v. Choe*, 156 Wn.2d 441, 455, 128 P.3d 574 (2006). DSHS delegates to foster parents primary responsibility "for the protection, care, supervision, and nurturing of the child in placement." RCW 74.13.330. That said, the legislature stopped short of creating substantive custody rights in foster parents. *See, e.g.*, RCW 74.13.300(3). Foster care placements are, by their nature, intended to be temporary. For this reason, the act of placing a child in foster care does not sever DSHS's relationship with the child as legal custodian or terminate DSHS's ongoing duty to protect dependent children in its care.[4]

In sum, the establishment of a dependency imposes essential rights and duties on the State to care for dependent children. *See, e.g.*, RCW 74.13.010 (duty to protect and care for dependent children), .031(3) (duty to investigate complaints of neglect, abuse, or abandonment of children), (6) (duty to monitor foster care

---

[4] The dissent fundamentally misunderstands the relationship between DSHS and foster children when it describes foster parents as independent *third parties*. *See* dissent at 1, 4-5. They are instead agents of DSHS, who carry out the day-to-day responsibilities entrusted to DSHS in its role as the legal custodian of dependent children. *See infra* pp. 23-26. It is remarkable that the dissent believes "no amount of due diligence or periodic investigation could prevent much of the harm" done by abusive foster parents to the children DSHS places in foster homes. Dissent at 4. Indeed, any faith society places in the child welfare system depends on DSHS exercising due diligence and adequately monitoring foster home placements.

placements), (7) (duty to provide child welfare services to dependent children), (9) (DSHS authorized to purchase care for dependent children). The State becomes the legal custodian of the dependent child, and the State alone controls the services provided to the child and determines where the child will reside. *See* JuCR. 3.8(e); RCW 13.34.130(1)(b)(ii); RCW 74.13.031(7). It is against this statutory backdrop that we consider whether DSHS's relationship with dependent foster children creates a special relationship supporting a common law duty in this case.

B. DSHS Owes a Common Law Duty To Protect Dependent Foster Children from Reasonably Anticipated Dangers

An essential element in any negligence action is the existence of a legal duty that the defendant owes the plaintiff. *Petersen v. State*, 100 Wn.2d 421, 425-26, 671 P.2d 230 (1983). While there is generally no duty to prevent a third person from intentionally harming another, a duty arises when "'a special relationship exists between the defendant and either the third party or the foreseeable victim of the third party's conduct.'" *Niece v. Elmview Grp. Home*, 131 Wn.2d 39, 43, 929 P.2d 420 (1997) (internal quotation marks omitted) (quoting *Hutchins v. 1001 Fourth Ave. Assocs.*, 116 Wn.2d 217, 227, 802 P.2d 1360 (1991)). A special relationship, and the accompanying duty to protect, arises where (1) the defendant has a special relationship with the third person that imposes a duty to control that person's conduct

or (2) the defendant has a special relationship with the victim that gives the victim a right to protection. *Id.* (quoting *Petersen*, 100 Wn.2d at 426 (quoting RESTATEMENT § 315)).[5] When a special relationship exists under § 315, the party owing a duty must use reasonable care to protect the victim from the tortious acts of third parties. RESTATEMENT § 314A cmt. e ("The duty in each case is only one to exercise reasonable care under the circumstances."); *Nivens v. 7-11 Hoagy's Corner*, 133 Wn.2d 192, 205, 943 P.2d 286 (1997).

Common examples of § 315(b) protective special relationships include the relationships between schools and their students, innkeepers and their guests, common carriers and their passengers, and hospitals and their patients. *See McLeod v. Grant County Sch. Dist. No. 128*, 42 Wn.2d 316, 320, 255 P.2d 360 (1953) (holding that a school has a duty to protect students from reasonably anticipated dangers); *Hutchins*, 116 Wn.2d at 227-28 (holding that an innkeeper has a duty to protect guests from the criminal actions of third parties); *Hunt v. King County*, 4 Wn. App. 14, 20, 481 P.2d 593 (1971) (holding that a hospital has a duty to protect

---

[5] *Restatement* § 315 provides:
There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
    (a)   a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
    (b)   a special relation exists between the actor and the other which gives to the other a right to protection.

patients from the reasonably foreseeable risk of self-inflicted harm through escape). In these situations, the defendant has a "special relationship" that imposes a duty of care to protect the plaintiff from foreseeable harm. The question we must resolve is whether the ongoing relationship between DSHS and dependent foster children similarly constitutes a special relationship within the meaning of § 315(b), giving rise to a duty to protect such children from reasonably anticipated dangers.

DSHS asserts that the Court of Appeals' finding of a special protective relationship between DSHS and dependent foster children represents "an unprecedented expansion of this Court's § 315(b) doctrine." State's Suppl. Br. at 10. According to DSHS, "[t]he existence of the § 315(b) protective duty depends on actual custodial care and control of the plaintiff and their environment," not entrustment and victim vulnerability, as the Court of Appeals held. *Id.* at 14. Under DSHS's approach, a § 315(b) special relationship requires "substantial control over the plaintiff's environment and notice of foreseeable harm giving rise to entrustment to the defendant's care, and a demonstration of an historic obligation to provide protection from third parties." Pet. for Review at 15. DSHS argues that because it does not exercise physical custody and control over foster children, the relationship between DSHS and dependent foster children falls outside the special relationship duty contemplated by § 315(b). State's Suppl. Br. at 10. In particular, DSHS notes

that "the comprehensive statutory child welfare system does not create this type of relationship between DSHS and foster children." *Id.*

DSHS's physical custody-and-control requirement is unsustainable for several reasons. First, neither the *Restatement* nor relevant case law suggests that § 315(b) special relationships are confined to situations of physical custody or control, as DSHS contends. Section 315(b) simply states that "a special relation exists between the actor and the other which gives to the other a right to protection." *See Caulfield v. Kitsap County*, 108 Wn. App. 242, 253, 29 P.3d 738 (2001) (describing § 315(b) special relationships as "'protective in nature, historically involving an affirmative duty to render aid'" (quoting *Hutchins*, 116 Wn.2d at 228)). Nowhere in § 315 do we see any mention of a requirement for physical custody or control. As noted, this court recognized in *Braam* that the State is "custodian and caretaker of foster children" and, as such, must "provide conditions free of unreasonable risk of danger, harm, or pain." 150 Wn.2d at 700. That DSHS has the authority and responsibility to place foster children in individual foster homes confirms, rather than detracts from, DSHS's custodial role. Indeed, this role is similar to other situations in which the State places vulnerable individuals with contractual caregivers, and courts recognize the State's tort duty under the theory of § 315(b). *See Niece*, 131 Wn.2d at 46-47 (recognizing duty of a group home to

protect a disabled resident raped by caregiver); *Caulfield*, 108 Wn. App. at 255-56 (holding § 315(b) special relationship existed between a county and a profoundly disabled adult when the county placed the plaintiff with an in-home caregiver and was responsible for monitoring the placement). Such caregivers are not merely third parties; they carry out the State's parens patriae responsibilities.

Section 315(b) of the *Restatement* is closely related to § 314A and § 320. *See* RESTATEMENT § 315 cmt. c.[6] Section 314A provides further insight into the contours of the special protective relationship by describing specific settings in which the duty to protect may be found, one of which is potentially relevant here. Subsection (4) of § 314A describes a special relationship giving rise to a duty to protect where "[o]ne who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other."[7] While subsection (4) references "custody,"

---

[6] Comment c to § 315 provides:
The relations between the actor and a third person which require the actor to control the third person's conduct are stated in §§ 316-319. The relations between the actor and the other which require the actor to control the conduct of third persons for the protection of the other are stated in §§ 314A and 320.

[7] Significantly, § 314A's list of special protective relationships is nonexclusive. RESTATEMENT § 314A caveat at 119 ("The Institute expresses no opinion as to whether there may not be other relations which impose a similar duty."); *id.* at cmt. b ("The relations listed are not intended to be exclusive, and are not necessarily the only ones in which a duty of affirmative action for the aid or protection of another may be found.").

there is no indication that § 314A requires ongoing *physical* custody. In fact, comment b following § 314A confirms that entrustment and vulnerability, not physical custody, are at the heart of the special protective relationship—"[t]he law appears, however, to be working slowly toward a recognition of the duty to aid or protect in any relation of *dependence* or of *mutual dependence*." RESTATEMENT § 314A cmt. b (emphasis added).

Section 320 of the *Restatement*, entitled "Duty of Person Having Custody of Another to Control Conduct of Third Persons," expands on the special protective relationship described in subsection (4) of § 314A.[8] Section 320 specifically identifies the "[h]elplessness of [the] other" as a decisive factor in the custody-based special relationship. RESTATEMENT § 320 cmt. b. As comment b to § 320 explains, "The circumstances under which the custody of another is taken and maintained may

---

[8] Section 320 provides:
One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal power of self-protection or to subject him to association with persons likely to harm him, is under a duty to exercise reasonable care so to control the conduct of third persons as to prevent them from intentionally harming the other or so conducting themselves as to create an unreasonable risk of harm to him, if the actor
    (a)   knows or has reason to know that he has the ability to control the conduct of the third persons, and
    (b)   knows or should know of the necessity and opportunity for exercising such control.

be such as to deprive him of his normal ability to defend himself, or to deprive him of the protection of someone who, if present, would be under a duty to protect him." For example, "a child while in school is deprived of the protection of his parents or guardian." *Id.* In this situation, "the actor who takes custody . . . of a child is properly required to give him the protection which the custody or the manner in which it is taken has deprived him." *Id.* Again, although § 320 refers to "custody," there is no indication that ongoing physical custody is required. Instead, the common thread running through § 315 and its related provisions, §§ 314A and 320, is the notion of vulnerability and entrustment. References to "dependence," "mutual dependence," and "helplessness" make this clear. RESTATEMENT §§ 314A cmt. b, 320 cmt. b.

DSHS's physical-custody-and-control test is also at odds with Washington case law. While the term "custody" appears throughout our § 315 cases, we have explained that it is not physical custody that creates the special relationship. Rather, special protective relationships "are based on the liable party's assumption of responsibility for the safety of another." *Niece*, 131 Wn.2d at 46; *Bishop v. Miche*, 137 Wn.2d 518, 528, 973 P.2d 465 (1999) (holding that the existence of a special protective relationship turns on not custodial control but the relationship between the actor and the third party). Echoing *Restatement* §§ 315, 314A, and 320, we have

characterized § 315(b) special relationships as being "'protective in nature, historically involving an affirmative duty to render aid,'" requiring the defendant "'to guard his or her charge against harm from others.'" *Niece*, 131 Wn.2d at 44 (quoting *Hutchins*, 116 Wn.2d at 228).

Contrary to DSHS's contention, our case law confirms that entrustment for the protection of a vulnerable victim, not physical custody, is the foundation of a special protective relationship. *See Niece*, 131 Wn.2d at 50 (finding that "[t]he duty to protect another person from the intentional or criminal actions of third parties arises where one party is 'entrusted with the well being of another'" (quoting *Lauritzen v. Lauritzen*, 74 Wn. App. 432, 440, 874 P.2d 861, *review denied*, 125 Wn.2d 1006 (1994))); *Nivens*, 133 Wn.2d at 202-03 (finding that the duty to protect arises where a business invitee "entrusts himself or herself to the control of the business owner over the premises and to the conduct of others on the premises"); *C.J.C. v. Corp. of Catholic Bishop of Yakima*, 138 Wn.2d 699, 721-22, 985 P.2d 262 (1999) (finding that the duty to protect arises where vulnerable children of a congregation are delivered into the custody and care of a church, whether on or off church premises); *Caulfield*, 108 Wn. App. at 255-56 (finding that the duty to protect arises where the relationship between the defendant and the plaintiff involves an element of entrustment, "i.e., one party was, in some way, entrusted with the well-

being of the other party"). Certainly, many of our § 315 cases involve factual scenarios where the plaintiff is in the physical custody of the defendant, as DSHS points out. But not a single decision identifies physical custody as a necessary condition for recognizing a § 315(b) special protective relationship.

While we reject DSHS's insistence on physical care and custody to establish a special protective relationship, it is nonetheless present in this case. Foster care involves a form of state custody—children are involuntarily removed from their homes by an affirmative act of the State and confined to a state system of foster care. In *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 201 n.9, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989), the United States Supreme Court recognized foster care as "sufficiently analogous to incarceration or institutionalization to give rise to an affirmative [State] duty to protect." Lower federal courts have similarly held that involuntary foster care placement constitutes state custody. *See, e.g., Walton v. Alexander*, 20 F.3d 1350, 1354 n.3 (5th Cir. 1994); *Norfleet v. Ark. Dep't of Human Servs.*, 989 F.2d 289, 293 (8th Cir. 1993). Placement in foster care does not remove a child from the State's custody. Foster parents act as agents of the State; however, the State, through DSHS, retains legal custody of the child throughout the duration of the dependency, and the State alone controls the placement of the child, determines the child welfare services to be

provided, and decides when the child will be removed from a foster home, placed with a new foster family, or returned to the family home.

DSHS unconvincingly seeks to minimize its role in Washington's child welfare system. According to DSHS, when children are placed in foster care, the agency's primary responsibility is to "'ensure that foster care placements are in the least restrictive, most family-like setting available.'" State's Suppl. Br. at 15 (quoting *Aba Sheikh*, 156 Wn.2d at 453). To provide the most family-like setting, the legislature devised a statutory scheme that "strikes a balance between imposing appropriate licensing requirements for foster homes and empowering foster parents." *Id.* Thus, as soon as a child is placed in foster care, "[f]oster parents are responsible for the protection, care, supervision, and nurturing of the child in placement," RCW 74.13.330, while DSHS's role is limited to coordinating and integrating services ordered by a juvenile court. *Id.* The State's main point seems to be that foster parents, not DSHS, supervise the general day-to-day activities of the foster child. State's Suppl. Br. at 16 ("Once DSHS places a child with foster parents, responsibility for the day-to-day supervision of the foster child is turned over to the foster parent, much the way a school turns responsibility back over to a parent at the end of a school day or function."). DSHS maintains that our statutory framework

thus denies it the "type of control, supervisory responsibility, or historic obligation akin to the other special relationships." Pet. for Review at 16.

The State's attempt to narrowly circumscribe DSHS's duties during foster care ignores its relationship with foster parents. The reason DSHS does not have day-to-day physical custody over dependent foster children is because DSHS contracts out its duty, as legal custodian, to foster parents. However, DSHS's delegation of physical custody to foster parents does not lessen its continuing responsibility to protect dependent children in its legal custody. We reject DSHS's view that once a child is placed in foster care, its relationship with that child becomes one of mere administrator of child welfare services. State's Suppl. Br. at 15. The governing statutes suggest otherwise. When a dependent child is placed in foster care, DSHS not only has a duty to investigate reports of child abuse and neglect, RCW 26.44.050, but also an ongoing duty to "monitor placements of children" to "assure the safety, well-being, and quality of care being provided is within the scope of the intent of the legislature." RCW 74.13.031(6), .010 ("The purpose of this chapter is to safeguard, protect, and contribute to the welfare of the children of the state."). DSHS remains primarily responsible for supervising and monitoring foster care placements. The State's refashioning of DSHS's role within the child welfare

system as a mere licensor of foster homes is at odds with the statutory framework in which it operates.[9]

Recognizing that DSHS stands in a special protective relationship with foster children will not lead to the unrestrained liability the State and the dissent fear. *See* Pet. for Review at 21 (warning that recognizing a common law duty "could lead to claims that DSHS erred by failing to prevent a wide variety of harms, such as a dog bite"); dissent at 5 (claiming grandparents and caregivers may be liable for negligence of camp counselors or community centers). The State is not vicariously liable for all acts of foster parents, and the scope of its duty is circumscribed by standards of reasonable care. In any situation involving a § 315(b) special relationship, the general duty is simply to use reasonable care to protect the other person from the criminal or tortious acts of third parties. RESTATEMENT § 314A cmt. e ("The duty in each case is only one to exercise reasonable care under the circumstances."). The issue of reasonable care turns on context within the legal framework that defines the parties' relationship. The duty of reasonable care is in

---

[9] The dissent suggests that the existence of statutes addressing DSHS's rights and responsibilities somehow precludes recognition of common law tort liability. *See* dissent at 2-3. However, we often look to statutory sources in connection with common law duties and have never suggested that statutory and common law liabilities are mutually exclusive. *See M.W. v. Dep't of Soc. & Health Servs.*, 149 Wn.2d 589, 599-600, 70 P.3d 954 (2003) (noting existence of both statutes and common law causes of action against DSHS).

turn limited by the concept of foreseeability. Only if a reasonable person in the defendant's position would be aware of a "general field of danger" posing a risk to one such as the plaintiff will a duty of care to protect the plaintiff be recognized. *Niece*, 131 Wn.2d at 50 (citing *Shepard v. Mielke*, 75 Wn. App. 201, 206, 877 P.2d 220 (1994)). Intentional or criminal conduct may not be foreseeable if it is "'so highly extraordinary or improbable as to be wholly beyond the range of expectability.'" *Id.* (quoting *Johnson v. State*, 77 Wn. App. 934, 942, 894 P.2d 1366 (1995)). In this regard, the State's duty is no broader than that of similarly situated private entities and concerns about limitless liability are without merit.

Finally, we reject the State's argument that recognizing DSHS owes a common law duty under § 315(b) conflicts with *M.W. v. Department of Social & Health Services*, 149 Wn.2d 589, 70 P.3d 954 (2003) and Washington child welfare statutes. DSHS relies on *M.W.* to argue that its liability must be limited to the "implied cause of action in RCW 26.44.050," i.e., the implied statutory cause of action for negligent investigation. State's Suppl. Br. at 22. In *M.W.*, we considered whether DSHS's statutory duty to investigate child abuse under RCW 26.44.050 encompassed a general duty of care to act reasonably during the course of an investigation. 149 Wn.2d at 595-96. We declined to recognize "a general statutory duty of care for a claim of negligent investigation," *id.* at 599, reasoning that the

"negligent investigation cause of action against DSHS is a narrow exception that is based on, and limited to, the statutory duty" and legislative purpose of the statute. *Id.* at 601. Our analysis, however, did not stop there. We identified one additional reason for our holding, which is particularly relevant to this case:

> Our conclusion not to expand the cause of action of negligent investigation is bolstered by our determination that DSHS has an existing common law duty of care not to negligently harm children. An expansion of the action of negligent investigation is therefore unnecessary.

*Id.* at 600. Rather than foreclosing the possibility of a common law cause of action against DSHS, we simply concluded that "[w]hether the facts of the present case are actionable at common law is not before us." *Id.* at 601. Our decision in *M.W.* therefore confirms, rather than rejects, common law claims based on a special relationship.

Recognizing DSHS's legal duty under the principles of § 315(b) furthers the overarching purpose of Washington's child welfare laws "to safeguard, protect, and contribute to the welfare of the children of the state." RCW 74.13.010. "'Accountability through tort liability . . . may be the only way of assuring a certain standard of performance from governmental entities.'" *Tyner v. Dep't of Soc. & Health Servs.*, 141 Wn.2d 68, 81, 1 P.3d 1148 (2000) (alteration in original) (quoting *Bender v. City of Seattle*, 99 Wn.2d 582, 590, 664 P.2d 492 (1983)). We affirm the Court of Appeals' holding that DSHS stands in a special relationship with foster

children in its charge. Under the theory of *Restatement* § 315(b), this special relationship supports recognition of a duty in tort to protect foster children from foreseeable harms at the hands of foster parents.

C. Recognizing DSHS's Common Law Duty To Protect Foster Children from Abuse Does Not Encroach on the State's Sovereign Immunity

DSHS insists that imposing a common law duty under § 315(b) amounts to judicial abrogation of the State's sovereign immunity. *See* Pet. for Review at 12-14; State's Suppl. Br. at 21-22. This argument reflects a fundamental misunderstanding of government liability in tort following the statutory waiver of sovereign immunity in 1961.

Article II, section 26 of the Washington Constitution authorizes the legislature to "direct by law, in what manner, and in what courts, suits may be brought against the state." In 1961, the legislature waived the State's sovereign immunity with respect to tort actions. LAWS OF 1961, ch. 136, § 1 (codified as RCW 4.92.090). This waiver statute provides, "The state of Washington, whether acting in its governmental or proprietary capacity, shall be liable for damages arising out of its tortious conduct to the same extent as if it were a private person or corporation." RCW 4.92.090. This statute is "one of the broadest waivers of sovereign immunity in the country" and makes the State presumptively liable for its alleged tortious

conduct "in all instances in which the Legislature has *not* indicated otherwise."

*Savage v. State*, 127 Wn.2d 434, 444-45, 899 P.2d 1270 (1995).[10]

In waiving sovereign immunity, the legislature consented to the imposition of liability against the State for its tortious conduct "to the same extent *as if* it were a private person or corporation." RCW 4.92.090 (emphasis added). Accordingly, when assessing the State's liability, it is appropriate to draw analogies between the State's conduct and comparable conduct performed in the private sector. *See Evangelical United Brethren Church of Adna v. State*, 67 Wn.2d 246, 253, 407 P.2d 440 (1965) (noting that tortious conduct "must be analogous, in some degree at least, to the chargeable misconduct and liability of a private person or corporation").

Here, the State asserts sovereign immunity because its conduct—i.e., "remov[ing] children from their parents and plac[ing] them into foster care"— involves a government function that cannot be undertaken by private persons or corporations. Pet. for Review at 12; *see also* State's Suppl. Br. at 20-21 ("No private sector entity collects and investigates reports of child abuse and neglect; intervenes in families and removes children from parents; or licenses foster parents, so that removed children can be placed into a natural, nurturing family environment.").

---

[10] In 1967, the legislature similarly waived the sovereign immunity of counties, cities, and other local governmental entities. LAWS OF 1967, ch. 164, § 1 (codified as RCW 4.96.010).

Essentially, the State argues that DSHS performs a uniquely governmental function that has no counterpart in the private sector, i.e., there is no "private analog." State's Suppl. Br. at 10. This argument fails for two reasons.

First, it ignores the legislature's directive to submit the State to tort liability *as if it were a private entity*. For tort liability to attach, the State does not necessarily have to be doing something that a private party does. Rather, RCW 4.92.090 recognizes that "the official conduct giving rise to liability must be *tortious*, and it must be analogous, in some degree at least, to the chargeable misconduct and liability of a private person or corporation." *Evangelical*, 67 Wn.2d at 253. Contrary to the State's interpretation, the focus of the waiver statute is on the presence of *tortious* conduct, rather than comparable private conduct. *Id.* at 252-53 (noting state "is rendered liable for damages only when such damages arise out of 'tortious conduct to the same extent as if it were a private person or corporation'" (quoting RCW 4.92.090)).[11] The State cannot shield itself from liability by simply asserting that its role in the foster care system has no direct counterpart in the private sector. Under our waiver statute, there is no "private analog" requirement.

---

[11] "Tortious" conduct does not include those high-level discretionary functions that are essential to governance. *Evangelical*, 67 Wn.2d at 253 ("'[I]t is not a tort for government to govern.'" (quoting *Dalehite v. United States*, 346 U.S. 15, 57, 73 S. Ct. 956, 97 L. Ed. 1427 (1953) (Jackson, J., dissenting))).

Second, there are comparable private relationships that give rise to a duty in tort. For example, private persons entrust the care of children in their custody to schools, camps, and day care centers on a daily basis. These entities in turn delegate responsibilities to teachers, counselors, and caregivers. DSHS is not performing a uniquely governmental function by delegating the care of a child in its custody to foster parents. We reject its attempt to use the shield of sovereign immunity to avoid defending against negligence claims for failing to protect foster children.

In sum, because DSHS is entrusted with the responsibility of protecting dependent foster children, who are particularly vulnerable and in need of protection, the Court of Appeals correctly recognized that DSHS owes a common law duty under *Restatement* § 315(b). Recognizing DSHS's protective duty is consistent with Washington's broad waiver of sovereign immunity. The potential for tort liability does not disregard the State's sovereign immunity but instead serves the goal of holding the State accountable "to the same extent as if it were a private person or corporation." RCW 4.92.090.

D. The Foster Children Produced Sufficient Evidence of Breach and Causation To Allow a Jury To Decide Their Claims.

As a distinct basis for dismissing the foster children's preadoption claims, DSHS argues that the evidence at trial was insufficient to create a jury question on

issues of breach of the duty of care, proximate cause, and damages. It asks us to affirm the trial court on this basis. *See* Pet. for Review at 22-24; State's Suppl. Br. at 22-24. We decline to do so.

We agree with the Court of Appeals that the foster children produced sufficient evidence from which a jury could find that DSHS breached its protective duty, and that the breach of that duty caused their injuries. *H.B.H.*, 197 Wn. App. at 95. In reviewing the CR 50 dismissal order, the evidence advanced at trial must be read in a light most favorable to the plaintiffs. *Hume v. Am. Disposal Co.*, 124 Wn.2d 656, 667, 669, 880 P.2d 988 (1994). While the trial testimony was certainly mixed, the Court of Appeals correctly identified evidence that showed DSHS breached its duty by failing "to conduct required health and safety checks—either at all or with sufficient regularity" during the preadoption period—and fell below the standard of reasonable care. *H.B.H.*, 197 Wn. App. at 92. As for causation, the Court of Appeals correctly credited the jury's ability to draw the inference that "but for the allegedly deficient health and safety checks, SAH or one of the other girls would have disclosed the abuse and the State would have intervened." *Id.* at 94-95.

The State challenges the Court of Appeals' breach and causation analysis as "complete speculation." State's Suppl. Br. at 22. But, crediting reasonable inferences is the stuff of juries, which is why courts generally leave questions of

breach and causation for juries to decide. *See Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999) ("Breach and proximate cause are generally fact questions for the trier of fact."). The trial court took that issue away from the jury through its CR 50 decision, even though there was sufficient evidence that, if believed, would support a finding of breach. Testimony and documentary evidence showed that SAH and HBH's social worker, Mary Woolridge, failed to conduct required health and safety checks for a full year, and a reasonable jury could find that this amounted to a breach of DSHS's duty to protect the children. The Court of Appeals did not err in holding that the foster children produced sufficient evidence of breach.

As for causation, this is a difficult issue in many tort cases. Certainly, linking DSHS's negligence to the continuation of abuse by the foster parents would require the jury to reconstruct a causal chain. And, the jury would need to decide whether the conduct of subsequent actors broke the causal chain. But, there was sufficient, albeit conflicting, evidence on these issues. Verbatim Report of Proceedings (VRP) (Feb. 9, 2015) at 8-14 (Woolridge's testimony), 62-68 (Barbara Stone's expert testimony). The trial court seems to have resolved these issues itself, in concluding, "I mean, does it really matter whether Mary Woolridge was or was not doing her health and safety visits. . . . I can't really see there are any claims based on anything

Mary Woolridge did or did not do." VRP (Mar. 5, 2015) at 83-84. Jurors might have viewed the evidence differently.

Resolution of the foster children's negligence claim against DSHS presents a close question, which the trier of fact could likely resolve either way. We agree with the Court of Appeals that the case should go to the jury on these issues and hold that the trial court erred in entering judgment as a matter of law under CR 50.

## CONCLUSION

The State, through DSHS, stands in a special relationship with foster children. While DSHS contracts with foster parents and others to provide day-to-day care for dependent children, the State alone is "custodian and caretaker of foster children." *Braam*, 150 Wn.2d at 700. Consistent with our precedent, we hold that the special relationship between DSHS and foster children gives rise to a protective duty under *Restatement* § 315(b). Recognition of this duty is wholly consistent with the legislature's waiver of the State's sovereign immunity. Questions of fact remain in this case as to whether DSHS breached its duty and whether it proximately caused the foster children's injuries. We affirm the Court of Appeals and remand this case to the trial court for further proceedings.

_____ Stephens, J.

WE CONCUR:

_____

_____ González, J.

_____

_____

_____

*HBH, et al. v. State of Washington, et al.*

No. 94529-2

MADSEN, J. (dissenting)—I disagree with the majority's conclusion that the

Department of Social and Health Services (DSHS) owes a common law duty to protect

dependent foster children from foreseeable harm. I write separately because the majority,

contrary to precedent and plain meaning, expands the meaning of *Restatement (Second)*

*of Torts* § 315(b)'s "special relationship" doctrine to include the relationship between

DSHS and foster children, imposing a duty where none would otherwise exist.

Discussion

In general, "there is no duty to prevent a third party from intentionally harming

another" unless, pursuant to *Restatement* § 315(b),

> "a special relation exists between the [actor] and the other which
> gives the other a right to protection."

*Niece v. Elmview Grp. Home*, 131 Wn.2d 39, 43, 929 P.2d 420 (1997) (quoting *Petersen*

*v. State*, 100 Wn.2d 421, 426, 671 P.2d 230 (1983)). In cases where such a special

relationship exists, the defendant owes a duty to the victim and must use reasonable care

to protect the victim from foreseeable harm. *See id.* at 44.

Despite years of precedent to the contrary, much of which the majority cites, the

majority baselessly holds that *Restatement* § 315(b) should be applied broadly—creating

a special relationship where the defendant does not have physical custody of the victim but entrusts the victim to the ultimate tortfeasor. The majority concedes that its motive in expanding *Restatement* § 315(b) is to ensure "''"[a]ccountability through tort liability . . . [which] may be the only way of assuring a certain standard of performance from governmental entities.'"'" Majority at 28 (second alteration in original) (quoting *Tyner v. Dep't of Soc. & Health Servs.*, 141 Wn.2d 68, 81, 1 P.3d 1148 (2000) (quoting *Bender v. City of Seattle*, 99 Wn.2d 582, 590, 664 P.2d 492 (1983))). However, we may not simply abandon our precedent to achieve a desired outcome or to effectuate a desired policy change, which is contrary to the carefully crafted statutory scheme adopted by the legislature. Rather, we may do so only in instances where the "'established rule is incorrect'" or "'when [its] legal underpinnings . . . have changed or disappeared altogether.'" *State v. Johnson*, 188 Wn.2d 742, 756-57, 399 P.3d 507 (2017) (alterations in original) (quoting *In re Rights to Waters of Stranger Creek*, 77 Wn.2d 649, 653, 466 P.2d 508 (1970); *W.G. Clark Constr. Co. v. Pac. Nw. Reg'l Council of Carpenters*, 180 Wn.2d 54, 66, 322 P.3d 1207 (2014)).

It is unclear why the majority aims to subject DSHS to a common law duty that has never been applied in the context of a DSHS-foster child relationship when the legislature has already enacted statutes establishing DSHS' rights and responsibilities.[1] *See* ch. 74.13 RCW. Indeed, the majority concedes this point, stating,

---

[1] The majority seems to misunderstand the argument here in stating that we "have never suggested that statutory and common law liabilities are mutually exclusive." Majority at 26 n.9. The special relationship exception "'do[es] not create new duties or eliminate recognized

2

> Balancing the interests of parents, children, and the State, the legislature has created a *comprehensive* statutory framework to govern the State's role as parens patriae in the child welfare system. The purpose of Washington's statutory scheme is "to safeguard, protect, and contribute to the welfare of the children of the state."

Majority at 9-10 (quoting RCW 74.13.010) (emphasis added) (citations omitted). The majority offers no justification for its decision to deviate from the legislature's "comprehensive statutory framework," which was created to protect "'the children of the state.'" *Id.* (quoting RCW 74.13.010). Whether the majority is satisfied with the statutory framework's rigidity is of no consequence—such concerns are policy considerations better suited for the legislature.

Additionally, in holding that DSHS owes a common law duty to protect foster children from reasonably anticipated dangers, the majority relies on the notion that a *Restatement* § 315(b) special relationship arises from entrustment, rather than physical custody. However, the majority primarily cites to cases where special relationships arose from physical custody. Specifically, the majority states:

> Common examples of § 315(b) protective special relationships include the relationships between schools and their students, innkeepers and their guests, common carriers and their passengers, and hospitals and their patients. *See McLeod v. Grant County Sch. Dist. No. 128*, 42 Wn.2d 316, 320, 255 P.2d 360 (1953) (holding that a school has a duty to protect students from reasonably anticipated dangers); *Hutchins [v. 1001 Fourth Ave. Assocs.,]* 116 Wn.2d [217,] 227-28[, 802 P.2d 1360 (1991)] (holding that an innkeeper has a duty to protect guests from the criminal actions of

---

duties.'" *Gregoire v. City of Oak Harbor*, 170 Wn.2d 628, 646, 244 P.3d 924 (2010) (Madsen, C.J., concurring/dissenting) (alteration in original) (quoting *Caulfield v. Kitsap County*, 108 Wn. App. 242, 251, 29 P.3d 738 (2001)). The issue here is not whether common law and statutory liability can coincide but, rather, that no common law duty exists, and the majority seeks to create one under the special relationship exception.

third parties); *Hunt v. King County*, 4 Wn. App. 14, 20, 481 P.2d 593 (1971) (holding that a hospital has a duty to protect patients from the reasonably foreseeable risk of self-inflicted harm through escape).

Majority at 16-17. Indeed, each of these examples—the relationships between schools and their students, innkeepers and their guests, common carriers and their passengers—involve physical custody, not entrustment. Importantly, the connection between physical custody and the duty to protect is logical.[2] In instances where the victim is in the defendant's physical custody and under the defendant's direct supervision, the defendant has a clear opportunity to prevent harm to the child. Such an opportunity does not exist where the defendant entrusted the victim to a third party because no amount of due diligence or periodic investigation could prevent much of the harm done by third parties.

The majority argues that DSHS' duty is similar to the defendant's duty in *Niece*. In that case, a disabled woman brought an action against a group home after a staff member at the group home sexually assaulted her. 131 Wn.2d at 41. We held that there was a "special relationship" between the group home and the disabled woman and, thus, the group home owed a duty to protect its residents from foreseeable harm. *Id.* The majority attempts to compare DSHS to the group home in *Niece* because DSHS, like the group home, was not the tortfeasor. But, the majority's reliance on this case is misplaced

---

[2] Indeed, "[a] determination of legal liability will depend upon 'mixed considerations of logic, common sense, justice, policy, and precedent.'" *Crowe v. Gaston*, 134 Wn.2d 509, 518, 951 P.2d 1118 (1998) (internal quotation marks omitted) (quoting *Schooley v. Pinch's Deli Market, Inc.*, 134 Wn.2d 468, 479, 951 P.2d 749 (1998)). The majority appears to base its argument entirely on its subjective sense of "justice"; meanwhile, it neglects each of the other equally important considerations.

4

because the majority ignores the key distinction between *Niece* and the case before us—

unlike DSHS, the defendant in *Niece* was in physical control of the plaintiff when the

offense occurred.[3] Indeed, the offense in *Niece* occurred *at the group home. Id.* at 42.

Receiving no help from any of our cases,[4] the majority moves on to *Restatement* §

314A and *Restatement* § 320 to hold that the existence of a "special relationship" is based

on the "notion of vulnerability and entrustment." Majority at 21. But, *Restatement* §§

314A and 320 do not define "special relationship," and § 315 makes no mention of

vulnerability or entrustment as considerations for determining a "special relationship."

As this court has recently reiterated, "Parties who *take custody* of another have a duty to

'protect them against unreasonable risk of physical harm'" under *Restatement* § 314A.

*Hendrickson v. Moses Lake Sch. Dist.*, No. 94898-4, at 7 (Wash. Nov. 1, 2018) (emphasis

added and omitted) (rejecting enhanced tort liability based on the special relationship

doctrine). I do not see how the majority can hold that a special relationship is based on

vulnerability and entrustment in the face of our current precedent.

---

[3] The majority characterizes the relationship between DSHS and foster parents as an agency relationship to fall under the special relationship exception. *See* majority at 14 n.4. Since the special relationship exception requires physical custody, not merely entrustment, the majority must show that DSHS retains physical custody through its agent—the foster parents. Agency law requires that the contractor must exercise a right to control the manner in which the work is completed. *See Afoa v. Port of Seattle*, 176 Wn.2d 460, 487, 296 P.3d 800 (2013). The statutory scheme does not provide DSHS with any authority to dictate the day-to-day supervision of the children by foster parents. The lack of control is fatal to the majority's argument that foster parents are agents of DSHS.

[4] Nor does the majority find support for its interpretation of *Restatement* § 315(b) in case law from other jurisdictions.

5

While the majority's goal is concededly to ensure government accountability, "[f]oisting [a new] rule upon courts and parties by judicial fiat could lead to unforeseen consequences." *In re Pers. Restraint of Carlstad*, 150 Wn.2d 583, 592 n.4, 80 P.3d 587 (2003). Indeed, the majority fails to recognize that its expansion of *Restatement* § 315(b) will apply beyond the facts of this case. For example, consider a situation in which a child who would otherwise be placed with DSHS is placed with grandparents. In such a scenario, the grandparents would be subject to the same common law duties that the majority aims to impart on DSHS. Thus, if the grandparents entrust the child to a summer camp, the grandparents would be liable for all of the foreseeable harm that the child might experience at the camp (e.g., bullying and fighting). Or, consider a scenario in which a caregiver who maintains custody of an elderly person, entrusts that elderly person to an elder care home or community center. Under the majority's interpretation of *Restatement* § 315(b), the caregiver would be liable for any foreseeable harm caused by a third party at the elder care home. Of course, these examples represent a small number of the consequences that will assuredly flow from the majority's holding.

Finally, the majority seeks to create liability under the special relationship doctrine, but we have consistently used the *Bennett* test to determine DSHS's liability. *Bennett v. Hardy*, 113 Wn.2d 912, 784 P.2d 1258 (1990). Under *Bennett*, courts look to (1) whether the plaintiff is within the class for whose benefit the statute was enacted, (2) whether legislative intent, explicitly or implicitly, supports creating or denying a remedy,

6

and (3) whether implying a remedy is consistent with the underlying purpose of the legislation. *Id.* at 920-21.

In *Ducote v. Department of Social & Health Services*, 167 Wn.2d 697, 222 P.3d 785 (2009), we held that stepparents do not have an implied cause of action against DSHS using the *Bennett* test. Similarly, in *Tyner*, 141 Wn.2d 68, we applied the *Bennett* test to find parents had an implied cause of action against DSHS for negligent investigations that erroneously removed children from a home.

The majority seeks to sidestep the outcome of applying our well-established precedent by invoking the special relationship doctrine. While chapter 74.13 RCW was indisputably created for the benefit of foster children, there is no evidence that the legislature sought to burden the State with the duty of having an ever vigilant and watchful eye over foster parents. Rather the duty imposed on the State is to monitor foster home placement monthly and to investigate alleged violations when they are discovered. RCW 74.13.031(6). Moreover, a statutory remedy is available if a department investigation deems criminal penalties against the foster home necessary for alleged violations similar to the instant case. RCW 74.13.031(3). Nothing here suggests an implied cause of action is warranted.

Because DSHS' rights and responsibilities are already defined in statute and because *Restatement* § 315(b)'s special relationship doctrine is limited to instances where the defendant had physical custody of the victim, I respectfully dissent.

Madsen, J.

Fairhurst, C.J.

Johnson

Wiggins, J.