IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| IAN ATKERSON, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF RUSTIN ATKERSON, | ) ) ) ) ) | No. 39483-2-III |
| Respondent, | ) ) | |
| v. | ) ) | PUBLISHED OPINION |
| STATE OF WASHINGTON, DEPARTMENT OF CHILDREN, YOUTH, AND FAMILIES, John and Jane Doe 1-10, | ) ) ) ) ) | |
| Petitioner. | ) | |

LAWRENCE-BERREY, A.C.J. — RCW 4.24.595(1) insulates governmental entities and their officers, agents, employees, and volunteers from liability in tort for their acts or omissions in emergent placement investigations of child abuse or neglect, unless the acts or omissions constitute gross negligence. The statute defines "emergent placement investigations" as investigations conducted prior to a shelter care hearing.

Here, the Department of Children, Youth, and Families (DCYF) began an investigation to determine whether 23-month-old Rustin Atkerson's broken arm and bruises were the result of child abuse or neglect. Two weeks later, and prior to DCYF's determination, Rustin sustained a fatal head injury from his mother's boyfriend.

The young boy's estate and his father brought suit against DCYF for negligent investigation. DCYF moved for summary judgment dismissal. The parties presented the trial court with dueling expert opinions as to whether the evidence DCYF knew or should have known would have resulted in Rustin being removed from his mother's care. The trial court struck the opinion of DCYF's expert, a retired superior court judge, on the basis that the danger of the opinion's unfair prejudice substantially outweighed its probative value. Yet it considered the opposing opinion from Atkerson's expert, a licensed independent clinical social worker. The trial court denied DCYF's summary judgment motion after concluding that RCW 4.24.595(1)'s gross negligence standard did not apply because DCYF's investigation did not result in a shelter care hearing.

After denying summary judgment, the trial court certified three questions to this court, and we granted certification of two—one involving the proper standard of liability and the other involving the stricken opinion. We conclude that RCW 4.24.595(1)'s gross negligence standard applies, even though no shelter care hearing occurred. We further conclude that the trial court erred by striking the opinion of DCYF's expert, apparently on the basis that a jury would attach too much weight to the retired judge's opinion. We remand for further proceedings consistent with this opinion.

FACTS

Elaine Hurd, who had a young son, Ben, began dating Ian Atkerson in 2012. Soon after, the three began living together. Hurd became pregnant, and Rustin was born on June 19, 2015.

Hurd had explosive outbursts toward Atkerson and Ben. In 2016, after the couple separated, Hurd refused to allow Atkerson to see Ben and Rustin.

In October 2016, Atkerson petitioned for custody of Rustin and filed a declaration critical of Hurd's parenting and mental health issues, along with declarations from witnesses concerning Hurd's disturbing behaviors. A court commissioner issued a temporary parenting plan and ordered Hurd to undergo an anger management evaluation. During her evaluation, Hurd admitted to lashing out and becoming uncontrollable when angry and having a problem with her temper. The court entered another temporary parenting plan in December 2016. The plan gave Hurd primary residential placement of Rustin and allowed Atkerson residential time with his son.

In early May 2017, Hurd and Atkerson participated in family court mediation. The mediation resulted in a signed agreement for shared residential time with Rustin. Soon after signing the agreement, Atkerson began noticing bruises on Rustin whenever Hurd

returned Rustin to him. In late May or early June, Atkerson called DCYF and reported

Rustin's bruises, but the agency had no record of his call.

On June 8, Hurd brought Rustin to a medical clinic. X-rays showed that Rustin

had fractures in his lower right arm, both to his ulna and his radius bones. An emergency

room physician's assistant (PA) reported the injury to DCYF. In the PA's report, she

noted that Rustin's arm was obviously broken because the deformity was detectable. The

PA reported that Hurd could not explain how Rustin was injured but Hurd said she got

Rustin from his father around 4:00 p.m. the day before, that Rustin said his right arm hurt,

but otherwise he "seemed fairly normal." Clerk's Papers (CP) at 570. The PA also

reported that Atkerson came to the hospital and said Rustin was fine when he gave Rustin

to Hurd the day before. The PA noted that a fall on an outstretched hand may have

caused the fractures but referred the matter to DCYF for parental neglect because "neither

parent knows how the break was caused and there was a delay in care for the break."

CP at 570. Atkerson also called DCYF and reported Rustin's broken arm, said that

Rustin broke his arm in Hurd's care, and that Rustin was fine before Hurd took him.

On June 8, DCYF assigned social worker Veronica Mabee to investigate Rustin's

injury. That day, Mabee screened in both the PA's and Atkerson's reports and forwarded

them to law enforcement. DCYF also received a report that day from Hurd. Hurd

reported that she was concerned Atkerson was not supervising Rustin because she had noticed previous scratches, bumps, and bruises when she got Rustin from Atkerson.

On June 9, Mabee went with a police officer to Hurd's Entiat address but could not locate her. Mabee spoke with Hurd's father who told her that Hurd, Ben, and Rustin all lived there. Later that day, Mabee was able to meet with Hurd at the local Child Protective Services (CPS) office. Hurd brought Rustin and Ben to the office.

Hurd explained that after she got Rustin from Atkerson on June 7, she noticed that Rustin's elbow was red and he was whiny, and the next day he was in distress. This differed from what Hurd told the PA the day before.

During the interview, Mabee saw Hurd accidentally smack Rustin in the face after he grabbed something out of her purse. Hurd did not acknowledge she had smacked Rustin and instead continued to speak with Mabee. This made Mabee suspicious of Hurd.

During the interview, Mabee spoke in private with Ben, who was almost eight years old. Ben told her that he was at school and did not know how Rustin broke his arm. He said his mother sometimes spends the night with friends and brings Rustin with her, and he had not seen his mother in the last three days. Mabee did not ask Hurd where she had been staying on June 7 or 8, even though those dates coincided with Rustin's broken arm.

On Sunday, June 11, Atkerson's mother called DCYF to report two new bruises on Rustin after Hurd delivered Rustin to Atkerson. According to the report, Hurd would not tell Atkerson where she was staying, but Hurd's current boyfriend might live in East Wenatchee.

The next morning, June 12, Mabee learned of Atkerson's mother's report. Mabee's supervisor, Jennifer Andrade, joined the case that day. Mabee forwarded the new report to law enforcement and called Atkerson's mother to follow up. That day, Atkerson left a voicemail with Mabee telling her of Rustin's new bruises and that he was not comfortable returning Rustin to Hurd.

On June 12, Mabee and a police detective went to Atkerson's home to visit Rustin and view the reported injuries. After speaking with Atkerson and viewing the new injuries, Mabee decided to meet again with Hurd.

On June 15, Mabee and a police detective met with Hurd at the local CPS office. According to her case note, Mabee and the detective were "even more convinced today that [Hurd] has some significant [mental health] issues . . . ." CP at 635. Hurd had no explanation for Rustin's recent injuries and only wanted to talk about Atkerson. Hurd claimed she had video evidence on her phone of Atkerson assaulting her. But when Hurd played the video, it showed nothing. When confronted with the lack of evidence, Hurd

6

rewound the video and told them to look closer. "However, even with a second look, the allegations of physical assault that [Hurd] is alleging that [Atkerson] did, is simply not supported by her video. There is no evidence that [Atkerson] even attempted to hurt her." CP at 635.

Mabee asked Hurd about Rustin's broken arm the week before. According to the case note, after getting Rustin from Atkerson, she and Rustin went home. Once there, she noticed that Rustin's elbow was red and suspected he had a bee sting. She told Mabee that it was not until the next day when, after meeting with her lawyer, she decided to take Rustin to a doctor.

In the June 15 case note, Mabee remarked that Hurd's physical appearance was concerning for drug use. Despite this, Mabee still did not ask Hurd where and with whom she stayed in East Wenatchee.

On June 15, Hurd took Rustin to an orthopedic surgeon, Dr. Richard Brownlee. Following that appointment, Dr. Brownlee called DCYF and reported that after reviewing Rustin's medical records he believed Rustin's bone fractures would have taken a significant force, much more than just falling down. Dr. Brownlee also reported that both parents blamed each other for Rustin's lower arm fractures but that someone must have known what happened because the type of injury that Rustin suffered would have caused

7

him to cry a lot. Dr. Brownlee also was concerned that when he was putting a new splint on Rustin, Rustin kept apologizing "as if he was doing something bad." CP at 640.

The next day, on June 16, Mabee and Andrade received Dr. Brownlee's report, and his opinion that Rustin's injury was caused by a significant force, not from falling down. He was unclear whether he thought Rustin's broken arm was caused by abuse. Mabee knew that Hurd had anger issues, she knew that Hurd's complaints against Atkerson were not credible, and she suspected that Hurd was dishonest, on drugs, and had mental health problems. Although Dr. Brownlee's opinion was unclear and a telephone call could clarify it, Mabee decided to follow up with him, "likely in about a week." CP at 564.

On June 22, Mabee learned that Rustin had suffered severe head trauma and had been taken to a local hospital. She went to the hospital. Once there, Mabee learned that Hurd was at a "'friend's house'" in East Wenatchee when Rustin was injured the day before, on June 21. CP at 566. Mabee then went to the sheriff's office to speak with Hurd. Hurd told Mabee she had been staying with her boyfriend, Steven Rowe. She giggled when she told Mabee she would have taken Rustin to the hospital earlier had she known he was bleeding in his brain.

That day, Mabee looked into Rowe's CPS history. In a June 22 chart note, Andrade wrote: "'[Social worker] Mabee was able to see that Mr. Rowe has some

concerning CPS history regarding his own children and a current NO contact order.'" CP at 931. Rowe's history involved violence and abuse against women and children. He had gone to prison for assaulting one of his daughters. Civil protection orders had been entered restraining him from contacting some of his ex-girlfriends and his own children.

In the days that followed, Rustin was flown to Harborview Hospital in Seattle for specialized care. During July, Rustin's condition worsened. Based on interviews after Rustin's injury, it became apparent to Mabee that Hurd failed to protect Rustin from harm at Rowe's house. Mabee learned that Hurd had left Rustin with Rowe at some point on June 21 to get groceries and returned later that evening. Hurd claimed she was not with Rustin at the time of his head injury and waited to call 911 until the next day.

Rustin died on August 3. The sheriff's office continued to investigate Rustin's death and the prosecutor's office charged Hurd with manslaughter in the second degree and criminal mistreatment in the fourth degree. Hurd pleaded guilty to a reduced charge of criminal mistreatment in the second degree and was sentenced to 12 months of confinement. Rowe was arrested and charged with assault of a child in the first degree.

In October 2017, DCYF determined that the allegations of physical child abuse and negligent treatment of Rustin were founded as to Hurd and Rowe.

9

*Procedure*

In May 2020, Atkerson, individually and on behalf of his son's estate, sued DCYF, claiming that its negligent investigation resulted in its failure to remove Rustin from Hurd's care, causing Rustin to suffer abuse and death. In September 2022, DCYF moved for summary judgment dismissal of Atkerson's negligent investigation claim. It raised two arguments pertinent to this appeal: first, Atkerson's negligent investigation claim must be dismissed because he could not prove, in accordance with RCW 4.24.595(1), that DCYF acted grossly negligent; and second, the information Atkerson asserted it should have known before Rustin's head injury would have been insufficient for it to remove Rustin from Hurd's care. In support of this second argument, DCYF submitted a declaration from its expert, retired Superior Court Judge Kitty-Ann Van Doorninck, who had served on the Pierce County bench for 24 years. Judge Van Doorninck opined that no reasonable judge would have authorized a pickup order for Rustin before June 21, even if DCYF knew the information Atkerson asserted it should have known.

Atkerson responded that RCW 4.24.595(1) and its gross negligence standard did not apply because DCYF had not conducted an "emergent placement investigation," as described by the subsection. Atkerson argued that an emergent placement investigation occurs during the 72 hours between when DCYF removes a child from a parent and the

10

shelter care hearing.  Alternatively, he argued even if the gross negligence standard

applied, it was a question of fact whether DCYF acted grossly negligent.

Atkerson produced a declaration from his own expert witness, Jane Ramon, a

licensed independent clinical social worker.  In her opinion, DCYF fell far below the

required standard of care in its investigation and failed to exercise even slight care,

resulting in Rustin's death.  She opined that had DCYF adequately investigated the case,

it would have discovered facts sufficient for a judge to have Rustin removed from his

mother's care prior to his fatal head injury.

Atkerson moved to strike Judge Van Doorninck's declaration.  He argued that the

Code of Judicial Conduct, Rules of Professional Conduct, court rules, and the common

law establish a policy banning the testimony of retired judges.  He also argued that the

evidence was inadmissible under ER 702 and ER 704 because it consisted of improper

legal conclusions.

The trial court held a hearing on Atkerson's motion to strike.  Following argument,

the court granted the motion, but relied on ER 403:

> So in terms of the motion to strike the testimony of Judge Van
> Doornick [sic]—and I already informed the parties at the hearing that it's a
> little unusual for a summary judgment motion to have a declaration from a
> judge telling a judge what a reasonable judge would do.  And—but
> understanding that, there is also a request to strike her testimony for the
> purposes of the jury trial. . . .  I am going to strike her testimony as it

> pertains to what a reasonable judge would do . . . . And I'm actually going to do it under ER 403, which wasn't argued . . . .
>
> *But the Court's concern is that the probative value is substantially outweighed by the danger of unfair prejudice when you have a judge explaining what a reasonable judge would do, as opposed to another witness who would testify as to what they have seen judges do in these circumstances.* It is quite prejudicial, and frankly, these are discretionary decisions to quite a bit of degree. And it's difficult for one judge to say what any other judge would do. . . . ER 403 I think is the appropriate rule here for exclusion.

Rep. of Proc. (RP) at 36-37 (emphasis added).

A few days later, the court heard argument and denied DCYF's motion for summary judgment. It concluded that the ordinary negligence standard applied to DCYF's investigation, not the gross negligence standard found in RCW 4.24.595(1). It further concluded that Atkerson presented genuine issues of material fact on its negligent investigation claim.

The trial court denied DCYF's motion for reconsideration, but it did certify three questions for appellate review, pursuant to RAP 2.3(b)(4). We granted review of two questions: "(1) whether the trial court erroneously refused to apply RCW 4.24.595(1) and its gross negligence standard; and (2) whether the trial court erroneously excluded retired Judge Van Doorninck's 'reasonable judge' testimony under ER 403." Comm'r's Ruling, *Atkerson v. DCYF*, No. 39483-2-III (Wash. Ct. App. Feb. 17, 2023).

12

ANALYSIS

APPLICABLE NEGLIGENCE STANDARD

DCYF contends the trial court erred by not applying the gross negligence standard of RCW 4.24.595(1). We agree.

*Standard of review*

We review denial of a summary judgment motion de novo. *Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). "When determining whether an issue of material fact exists, the court must construe all facts and inferences in favor of the nonmoving party." *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 552, 192 P.3d 886 (2008).

*Child abuse and dependency statutes*

Chapter 26.44 RCW governs the duty to report child abuse or neglect. *Desmet v. Dep't of Soc. & Health Servs.*, 17 Wn. App. 2d 300, 307, 485 P.3d 356 (2021), *aff'd*, 200 Wn.2d 145, 514 P.3d 1217 (2022). Chapter 13.34 RCW governs dependency actions. *Id*. The legislature enacted chapter 26.44 RCW and chapter 13.34 RCW as part of a comprehensive child welfare system that is guided by the principle that the child's health and safety is of paramount concern. *Id.* (citing RCW 26.44.010; RCW 13.34.020;

*H.B.H. v. State*, 192 Wn.2d 154, 164, 429 P.3d 484 (2018)). "'When the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, the rights and safety of the child should prevail.'" *Id*. (quoting RCW 13.34.020).

When CPS social workers have reasonable cause to believe that a child has been abused or neglected, they are required to report the incident to law enforcement or to DCYF. *Id*. at 308 (citing RCW 26.44.030(1)(a)). A law enforcement officer may take a child into custody without a court order "'if there is probable cause to believe that the child is abused or neglected and that the child would be injured or could not be taken into custody if it were necessary to first obtain a court order.'" *Id*. (quoting former RCW 26.44.050 (2020)). Once a report has been filed, RCW 26.44.050 requires law enforcement or DCYF to investigate and "where necessary to refer such report to the court."

*Negligent investigation cause of action*

In *Tyner v. Department of Social and Health Services*, 141 Wn.2d 68, 82, 1 P.3d 1148 (2000), our Supreme Court recognized that parents have an implied cause of action against the Department under RCW 26.44.050 for negligent investigation of child abuse allegations. *Desmet*, 17 Wn. App. 2d at 309. This cause of action is a "narrow

exception" to the rule that there is no general tort claim for negligent investigation. *M.W. v. Dep't of Soc. & Health Servs.*, 149 Wn.2d 589, 601, 70 P.3d 954 (2003).

To prevail on a negligent investigation claim, the claimant must show that DCYF "gathered incomplete or biased information that results in a harmful placement decision, such as removing a child from a nonabusive home, placing a child in an abusive home, or letting a child remain in an abusive home." *Id*. at 602. A claimant also must show that the faulty investigation was a proximate cause of the harmful placement decision. *McCarthy v. Clark County*, 193 Wn. App. 314, 329, 376 P.3d 1127 (2016).

However, the legislature, by later enacting RCW 4.24.595(1), limited the scope of this cause of action by granting DCYF immunity for emergent placement investigations and decisions, unless its actions or omissions were grossly negligent. That statutory subsection provides:

> Governmental entities, and their officers, agents, employees, and volunteers, are not liable in tort for any of their acts or omissions in emergent placement investigations of child abuse or neglect under chapter 26.44 RCW including, but not limited to, any determination to leave a child with a parent, custodian, or guardian, or to return a child to a parent, custodian, or guardian, unless the act or omission constitutes gross negligence. *Emergent placement investigations are those conducted prior to a shelter care hearing under RCW 13.34.065.*

RCW 4.24.595(1) (emphasis added).

15

Under RCW 13.34.065(1)(a), when a child is removed from their parents' custody, or when CPS seeks removal, "the court shall hold a shelter care hearing within 72 hours." "The primary purpose of the shelter care hearing is to determine whether the child can be immediately and safely returned home while the adjudication of the dependency is pending." *Id.*

Here, the trial court concluded that RCW 4.24.595(1) and its gross negligence standard do not apply. The court reasoned:

> [G]ross negligence doesn't apply in this case because there was no shelter care hearing. The statute is intended to protect CPS and [the Department] when it makes a decision to remove a child from a home, and that's just not what happened here.
> So I'm not going to apply the gross negligence standard; I don't think it's appropriate in this case.

RP at 72-73.[1]

---

[1] The trial court based its decision on *Peterson v. Department of Social and Health Services*, noted at 9 Wn. App. 2d 1079, 2019 WL 3430537 at *5, where the court interpreted RCW 4.24.595(1) to "grant the Department immunity for investigations that result in an emergent removal and shelter care hearing regardless of the exact timing of any of the particular events." In *Peterson*, CPS placed a child in emergency foster care after receiving reports of sexual abuse and filed a dependency petition. *Id.* at *2. On appeal from the Department's summary judgment motion, the court held that the Department had conducted an "emergent placement investigation" because of the "closeness in time of its investigation preceding the shelter care hearing." *Id.* at *5. Although the *Peterson* court analyzed many of the same arguments that Mr. Atkerson advances in this appeal, it noted that it was not defining "the parameters of what constitutes an emergent placement investigation beyond the facts of this case." *Id.* at *6 n.5.

*The gross negligence standard applies to DCYF's investigation*

This appeal requires us to interpret RCW 4.24.595(1). We review questions of statutory interpretation de novo. *Jametsky v. Olsen*, 179 Wn.2d 756, 761, 317 P.3d 1003 (2014). The primary goal of statutory interpretation is to determine and give effect to the legislature's intent. *Gray v. Suttell & Assocs.*, 181 Wn.2d 329, 339, 334 P.3d 14 (2014). To determine legislative intent, we look at the plain language of the statute, consider the text of the provision, the context of the statute, any related statutory provisions, and the statutory scheme as a whole. *Id.* We must apply the statute as written; "we cannot rewrite plain statutory language under the guise of construction." *McColl v. Anderson*, 6 Wn. App. 2d 88, 91, 429 P.3d 1113 (2018). If the plain meaning of the statute is unambiguous, we apply that meaning. *Ronald Wastewater Dist. v. Olympic View Water & Sewer Dist.*, 196 Wn.2d 353, 364, 474 P.3d 547 (2020).

Under Atkerson's interpretation, application of the gross negligence standard is predicated on the removal of the child and the scheduling of a shelter care hearing. He points to the statute's reference to the shelter care statute, RCW 13.34.065, and argues that the statutes, when read together, define "emergent placement investigation" as one that occurs within the 72-hour period after a child is taken into custody and before a shelter care hearing.

DCYF responds that the statute does not condition application of the gross negligence standard on an investigation that results in taking the child from their parents and scheduling a shelter care hearing. It points to the plain language of the statute. For the reason explained below, we agree with DCYF.

RCW 4.24.595(1) limits the liability of governmental entities and its agents for acts or omissions "in emergent placement investigations of child abuse or neglect under chapter 26.44 RCW," including "any determination to leave a child with a parent." Thus, the legislature chose to limit liability even for DCYF determinations resulting in a child being left with a parent. And, because such determinations would not result in a shelter care hearing, RCW 4.24.595(1) applies even when an investigation results in no shelter care hearing.

This conclusion is not inconsistent with later language in RCW 4.24.595(1), which defines "emergent placement investigations" as "those conducted prior to a shelter care hearing." A review of both RCW 4.24.595 subsections shows that the legislature created a temporal divide between when tort liability would be premised on a gross negligence standard, RCW 4.24.595(1), and when tort liability would be either precluded or premised

18

on a witness immunity standard, RCW 4.24.595(2).[2] The temporal divide is the shelter

care hearing, when court orders are often first issued.

Atkerson, argues that RCW 4.24.595(1) is in derogation of the common law

negligence standard, as confirmed in *Tyner*, so the statute must be strictly construed to

limit its application to those situations clearly within its scope. We agree, and our strict

construction of the statute's scope is based on the statute's express language.

Atkerson also argues that "emergent" means "expeditious," and there is nothing

expeditious about an investigation that spans two weeks, such as the investigation in this

case. In a similar vein, he argues that an emergent placement investigation must be

limited to an investigation conducted within the 72-hour window between when a child is

removed from a parent and the shelter care hearing. We disagree.

First, with respect to Atkerson's "expeditious" argument, an investigation into

child abuse or neglect often requires contacting several witnesses—including family

members, teachers, and doctors; it also requires obtaining reports—including police,

medical, and court records. Given the scope of information required for an accurate

---

[2] RCW 4.24.595(2) provides: "[DCYF] and its employees shall comply with the orders of the court, including shelter care and other dependency orders, and are not liable for acts performed to comply with such court orders. In providing reports and recommendations to the court, employees of [DCYF] are entitled to the same witness immunity as would be provided to any other witness."

investigation, an expeditious investigation can take several days, if not weeks. Second, with respect to his 72-hour argument, if the legislature intended to limit an emergent placement investigation to the 72 hours prior to a shelter care hearing, it could have said so. It did not. Nothing in the subsection mentions this 72-hour window.

We conclude that DCYF's investigation into Rustin's abuse and neglect was an emergent placement investigation, as contemplated by RCW 4.24.595(1), and its liability and the liability of its agents are premised on gross negligence.

REASONABLE JUDGE TESTIMONY UNDER ER 403[3]

The Department contends the trial court erred by excluding the opinion of retired Judge Van Doorninck under ER 403. We agree.

*Standard of review*

The parties dispute the applicable standard of review. DCYF contends we should review the trial court's evidentiary decision for an abuse of discretion. Atkerson argues we should review the decision under a de novo standard, a standard that would more easily allow reversal. Atkerson is correct.

---

[3] In their briefing, the parties additionally raise the arguments raised below, whether Judge Van Doorninck's opinion is admissible under ER 702 and ER 704. However, the trial court excluded the retired judge's testimony under ER 403, and we did not accept review of any broader evidentiary issue.

"An appellate court would not be properly accomplishing its charge if the appellate court did not examine *all* the evidence presented to the trial court, including evidence that had been redacted. The de novo standard of review is used by an appellate court when reviewing all trial court rulings made in conjunction with a summary judgment motion." *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998). This standard is consistent with an appellate court's charge of conducting the same inquiry as the trial court. *Id.*

*ER 403*

Under ER 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Under the rule, there is a presumption favoring admissibility, and the burden is on the party seeking to exclude the evidence to show that the probative value is substantially outweighed by the undesirable characteristics. *Carson v. Fine*, 123 Wn.2d 206, 225, 867 P.2d 610 (1994). The ability of the danger of unfair prejudice to substantially outweigh the probative force of evidence is "'quite slim'" where the evidence is undeniably probative of a central issue in the case. *Id*. at 224.

Nearly all evidence will prejudice one side or the other. *Id.* Evidence is not rendered inadmissible under ER 403 just because it is prejudicial. *Id.* Rather, ER 403 is concerned with what is termed "unfair prejudice," usually meaning prejudice caused by evidence that is more likely to arouse an emotional response than a rational decision among the jurors. *State v. Powell*, 126 Wn.2d 244, 264, 893 P.2d 615 (1995). "When evidence is likely to stimulate an emotional response rather than a rational decision, a danger of unfair prejudice exists." *Id.*

Here, DCYF retained retired Judge Van Doorninck as an expert witness and sought to have her declaration admitted in support of its summary judgment motion. Her testimony consisted of her opinion that a reasonable judge would have denied DCYF's attempts to remove Rustin from his parents' care based on the evidence Atkerson claimed DCYF should have known. In the retired judge's opinion:

> [T]he available evidence that would have been provided to the court in a dependency proceeding if initiated between June 8 and 21, 2017 was insufficient, on a more probable than not basis, for a reasonable judge to make the statutorily-required findings of a risk of imminent harm and a continuing threat of substantial harm following Rustin's disclosed arm injury and reported bruises.
>         . . . .
> My opinion would be maintained even if a reasonable judge had considered information about Rustin's injury relayed to CPS from surgeon Dr. Richard Brownlee, because there was no indication of a risk of imminent harm resulting from uncertainty about how the earlier fracture occurred and who might have known the reason.

Moreover, my opinion would also be maintained even if a reasonable judge had been made aware that Rustin's mother was dating a man named Steven Rowe, because Rustin was legally in the care of his parents and not Mr. Rowe, and there was no indication Rustin's health, safety and welfare were being seriously endangered by Mr. Rowe prior to June 21, 2017. Further, on a more probable than not basis, a reasonable judge would have found the mere identity of Mr. Rowe, and even a history of CPS involvement involving other minors, too speculative to suggest a risk of imminent harm to Rustin while in his mother's lawful custody.

To summarize the foregoing analysis, it is my opinion that a reasonable judge would have more probably than not denied a "pickup order" brought by the State and disallowed Rustin's removal from his parents' joint custody between June 8 and 21, 2017. A ruling to the contrary would have been inconsistent with the agreed terms of a final Parenting Plan that the court entered within that same timeframe, and not supported by facts sufficient to make required findings under RCW 13.34.050.

CP at 750-51.

In response, Atkerson submitted a declaration from his own expert, Jane Ramon. In comprehensive detail, Ramon's declaration discusses significant omissions in Mabee's investigation that violated DCYF's policies and constitute "egregious violation[s] of the standard of care." CP at 898. She faults Mabee for not treating Dr. Brownlee's referral with the urgency required. She points to the warning signs of Hurd's mental illness, drug use, and dishonesty, her known anger issues, and faults Mabee for not further investigating when Hurd told her on June 16 that she stayed in Wenatchee rather than with her father in Entiat. She notes that Mabee, in her deposition, admitted she should

23

have asked questions that would have elicited useful responses from Hurd about where

she was living.

Similar to Judge Van Doorninck, Ramon provided an opinion on whether a judge

would have authorized Rustin's removal:

> Steven Rowe's disturbing criminal and CPS history is one of the more
> astounding set of facts I have seen in all my professional years. The State's
> witnesses claim that even if a judge was presented with evidence that Rustin
> (who had unexplained broken bones and bruising) was staying with Steven
> Rowe, a convicted felon with an extensive CPS history and criminal history
> related to abuse of his own children, and who was not even allowed to see
> his own children, that the judge would still not have taken action to protect
> Rustin. I have never once in my career experienced a judge who would be
> given all of these facts, and asked to protect a toddler, and then refused my
> request.

CP at 900.

DCYF argues that retired judges can serve as expert witnesses and that the trial

court misapplied ER 403 by allowing Atkerson's expert to proffer an opinion on the same

issue it precluded its expert. We agree.

Our Supreme Court has permitted even a sitting judge to testify as an expert

witness and to respond to hypothetical questions. In *Petersen v. State*, 100 Wn.2d 421,

443, 671 P.2d 230 (1983), the Supreme Court held that the trial court did not abuse its

discretion by allowing a sentencing judge to respond to a hypothetical question by

plaintiff's counsel about how he would have ruled. There, "[p]laintiff's counsel posed a

hypothetical question assuming a number of facts previously presented as evidence and asked whether, assuming those facts, [the judge] would have ordered a probation revocation hearing." *Id*. at 442.

In addition, our Supreme Court has made clear that ER 403 is concerned with "unfair prejudice," which "is caused by evidence likely to arouse an emotional response rather than a rational decision among the jurors." *Carson*, 123 Wn.2d at 223. And as noted previously, the ability for unfair prejudice to substantially outweigh the probative value of evidence is "'quite slim'" where the evidence is undeniably probative of a central issue in the case. *Id*. at 224. Further, ER 403 must be administered in an evenhanded manner. *Id*. at 225.

Here, Judge Van Doorninck's opinion is not likely to arouse an emotional response from jurors; rather, it appeals to rational thinking about whether a reasonable judge would have authorized a pickup order. Moreover, the retired judge's opinion concerns a central issue in the case, i.e., whether DCYF's omissions in investigating Rustin's abuse were a proximate cause of his fatal injury. Finally, the trial court's decision was not evenhanded because it considered Jane Ramon's declaration on the same issues it excluded Judge Van Doorninck's, seemingly because a jury would attach too much weight to a retired judge's opinion.

Atkerson additionally argues that Judge Van Doorninck's testimony should be restricted under ER 403. He contends the Code of Judicial Conduct (CJC), the Rules of Professional Conduct (RPCs), court rules, and common law establish a policy that narrows the circumstances in which a "former or present judge" can be a witness.[4] Br. of Resp't at 53. We are not persuaded.

Atkerson's argument that the CJC and its policy apply to Judge Van Doorninck's testimony is without merit. As he acknowledges in his brief, the CJCs apply only to "judges," which is defined as "anyone who is authorized to perform judicial functions, including an officer such as a magistrate, court commissioner, part-time judge or judge pro tempore." CJC, Application, I(A). Atkerson provides no authority that the CJCs or the underlying policies apply to a retired judge.[5] Where no authority for an assertion is made, we may presume none exists. *DeHeer*, 60 Wn.2d at 126.

---

[4] Although Atkerson points to the RPCs and court rules to support his argument, he cites to no specific RPC or court rule. Nor does he provide any supportive argument for his assertion that the RPCs and court rules establish a policy to narrow the circumstances when a former or present judge can be a witness. We decline to address these arguments. "Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration." *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998). Where no authority for an assertion is made, we may presume none exists. *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962).

[5] Atkerson's citation to the Texas Supreme Court's interpretation of its code of judicial conduct is also unavailing. First, Texas's code of judicial conduct is not

No. 39483-2-III
*Atkerson v. DCYF*

We conclude that the trial court erred when, under ER 403, it excluded Judge Van

Doorninck's opinion. We reverse and remand for proceedings consistent with this

opinion.[6]

_Lawrence-Berrey_, A.C.J.
Lawrence-Berrey, A.C.J.

WE CONCUR:

_Staab, J._
Staab, J.

_Cooney, J._
Cooney, J.

---

applicable to judges in Washington. Second, the case concerns the testimony of a retired judge who continued to sit on cases. *Joachim v. Chambers*, 815 S.W.2d 234, 235-41 (Tex. 1991). Here, there is no evidence that Judge Van Doorninck continues to sit on cases.

[6] The parties briefed and orally argued whether, if we decided the two certified issues in DCYF's favor, Atkerson's evidence was sufficient to defeat summary judgment. Although briefed and argued, the question was not certified to us, and we decline to address it.